HUGHES *et al. v.* STATE.

(*Jackson,* April Term, 1940.)

Opinion filed June 13, 1940.

WM. A. SHOAF and L. E. GWINN, both of Covington, for plaintiff.

NAT TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

Byron Hughes and Frank Lowe, referred to herein as defendants, have appealed from a conviction of feloniously operating a gaming house, their punishment being fixed at a fine of $200 and a jail sentence of eleven months and twenty-nine days.

Defendants operated a night club in Tipton County on U. S. Highway No. 51 just north of the Shelby County line. Its name was "Little Peabody." It had been in operation about six months when between ten-thirty and eleven o'clock on the night of May 6, 1939, C. J. West, Chief of the State Highway Patrolmen for West Tennessee, together with five members of his force, raided this club, arresting the defendants and, with the use of axes, destroyed two roulette wheels, four gambling or dice tables, and six or eight slot machines, all of the value of $4,000.

We quote from the testimony of Mr. West as follows:

"Q. Now, Mr. West, you had five men with you? A. Yes.

"Q. Where did you get together before the raid? A. In Memphis.

"Q. What time? A. Possibly 7 o'clock.

"Q. How did you go out there? A. In an automobile and a truck.

"Q. What kind of truck? A. Dodge.

"Q. That was your purpose when you left home? A. Yes.

"Q. And did do it? A. Yes, because I had orders.

"Q. How long have you been with the State? A. Several years.

"Q. When did you decide to make this raid? A. I was informed by the Governor at Humboldt that day to make the raid and had information from respectable citizens of Tipton County that gambling was going on at the Little Peabody.

"Q. And you went immediately to Tipton County that day? A. Yes.

"Q. Upon that information that you received from the Governor and respectable citizens of Tipton County you left Memphis with a determination to raid the place? A. My orders.

"Q. Acting under instructions? A. I was instructed to raid if violation of the law in my presence.

"Q. You were informed by respectable citizens that they operated a gambling house and slot machines? A. Yes.

"Q. You did not get a search warrant after you received that information? A. No, sir. Didn't need one."

When the raid was made there were between three and four hundred men and women patrons present and most of them were engaged in gambling. The testimony of West and his associate, C. V. French, was duly excepted to upon the ground that their testimony was obtained as a result of a trespass and an unreasonable search and seizure of private property in violation of Article 1, Section 7, of the State Constitution, which is as follows:

"That the people shall be secure in their persons, houses, papers and possessions, from unreasonable

searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty, and ought not to be granted.''

It is not seriously insisted by the State that ''Little Peabody'' was a club to which the public in general was invited. The evidence shows that it was an exclusive club in the sense that only members and invited guests were admitted. It appears that residents of Tipton County were not admitted, the patronage being largely confined to residents of Memphis. While the club served meals and soft drinks, it did not do so either inside or outside of the building to the general public. The record contains no evidence of service to outsiders, and the raiding squad does not claim that they visited this place as guests and patrons but officially for the purpose of ascertaining whether gambling was being carried on, and if so, to terminate it and to destroy the paraphernalia used for that purpose. These patrolmen had no search warrant, no warrant for the arrest of any person at this club, and no information that either of the defendants had or were committing a felony. They did not make any arrest until they had entered the building, observed the gambling, and probably destroyed the equipment. An attendant was stationed at the entrance to prevent outsiders from entering. According to these patrolmen upon their entry, the doorkeeper fled. This building was located on the west side of the highway, facing east, the distance from the highway to the entrance being 67 feet. The officers claimed that the front door was open. This is denied by witnesses for defendants. This is an immaterial issue since the officers do not claim that they

were invited to enter this building. The front entrance to the building opens into a hall which is 8 feet in width and 19 feet in length. A door on the right side of this hall leads into the dining room and bar. There is a 5-foot draped opening from the dining room to the club-room where the gambling machines and tables are located. There is a door in the west end of the front hall that opens into a small cloakroom, and opposite this door there is an opening 2 feet and 8 inches in width leading into the clubroom. Officer West testified that when they entered the front hall its west door was open and looking through same and the opening in the west wall of the cloakroom he could see gambling going on in the clubroom. We think he is mistaken about this since the weight of the testimony shows that this door was locked, but was opened by French after he and West had passed through the dining room into the clubroom.

It is admitted that these patrolmen are not peace officers of the county within the meaning of our search and seizure statutes; also that no statute of this State imposes upon them the duty of enforcing the gaming laws.

The State, in effect, concedes that if this raid had been made by peace officers of Tipton County that the evidence so obtained would have been incompetent, but contends that these patrolmen occupied the status of private citizens and were not acting as representatives or agents of the State Government. To this we are unable to agree. These patrolmen were dressed in uniforms, armed with pistols and axes, were proceeding in conformity with what they conceived to be their duty as officers and agents of the State, and, according to their testimony, were acting under the instructions of the Chief Executive of the State, who, by Article 3, Section 10, of

the State Constitution, "shall take care that the laws be faithfully executed."

The State Highway Patrol was created by Chapter 25, Section 1, Extra Session of 1929, embraced in sections 11460-11465 of the Code. Each member is required to execute a bond in the sum of $2,500, and to subscribe to an oath to support the Constitution of Tennessee, and to honestly and faithfully discharge their duties as members of said patrol. After specifically defining their duties, the act provides that "the members of the Tennessee highway patrol are clothed with all such necessary police powers as will enable them properly to perform their duty, as outlined and defined in the preceding section, including the right to make arrests and the right to serve criminal warrants and subpoenas for witnesses." The act further provides that while they are in uniform and on active duty they may wear or carry a pistol.

By subsection 3 of Section 15, Chapter 49, Public Acts of 1939, it is provided:

"The State Highway Patrol shall be authorized and it shall be their duty to assist the County and Municipal police authorities to enforce the provisions of this Act, and any other Act relating to the manufacture, sale or distribution of alcoholic beverages, as herein defined, in any County or Municipality failing to adopt the rights granted under the various provisions of this Act."

Clearly, therefore, the members of the State Highway Patrol are governmental officers and agents and were acting in their official capacity, and not as individuals, in raiding this club. Upon the question of the admissibility of evidence thus obtained this court, in *Hughes* v. *State,* 145 Tenn., 544, 551, 238 S. W., 588, 590, 20 A. L. R., 639, said:

"There is no conflict of authority upon the proposition

that the constitutional provisions relied upon can only be invoked in this way to protect the citizen against the activities of the government. For example, the provisions of the federal Constitution can only be invoked against the activities of the agencies of the federal government and likewise the rights of the citizens involved in the constitutional provisions referred to are only protected against the actions of officers of the state government. It is only when persons are acting under color of authority from the government that evidence developed in violation of the law can be at all rejected. *Cohn* v. *State,* 120 Tenn., 61, 109 S. W., 1149, 17 L. R. A. (N. S.), 451, 15 Ann. Cas., 1201; *Boyd* v. *United States,* 116 U. S., 619, 6 S. Ct., 524, 29 L. Ed., 746; *Adams* v. *New York,* 192 U. S., [585], 586, 24 S. Ct., 372, 48 L. Ed., 575. None of the cases go to the extent of holding that because evidence has been obtained by unlawful means it is therefore inadmissible; it is only when evidence has been obtained by means of unlawful conduct of government officials in violation of the provisions of the Constitution referred to that it has been held inadmissible in any of the cases.''

In *Gouled* v. *United States,* 255 U. S., 298, 41 S. Ct., 261, 263, 65 L. Ed., 647, the defendant was convicted of being a party to a conspiracy to defraud the United States. It appears that one Cohen, a private in the Army, attached to the Intelligence Department, and a business acquaintance of defendant, Gouled, under direction of his superior officers, pretending to make a friendly call upon the defendant, gained admission to his office, and, in his absence, without warrant of any character, seized and carried away several documents; that one of these papers, described as ''of evidential value only,'' and belonging to Gouled, was subsequently delivered to the Unit-

ed States district attorney, and was by him introduced in evidence over the objection of the defendant that possession of it was obtained by a violation of the 4th Amendment prohibiting unlawful searches and seizures. The question submitted to the Supreme Court was this:

"Is the secret taking, without force, from the house or office of one suspected of crime, of a paper belonging to him, of evidential value only, by a representative of any branch or subdivision of the government of the United States, a violation of the Fourth Amendment?"

The court held that it was. With respect to decisions taking a contrary view, the court said:

"Without discussing them, we cannot doubt that such decisions as there are in conflict with this conclusion are unsound, and that, whether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the government of the United States by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, any search and seizure subsequently and secretly made in his absence falls within the scope of the prohibition of the Fourth Amendment," etc.

At the same term, but subsequent to the decision in the *Gouled Case,* the court held in *Burdeau* v. *McDowell,* 256 U. S., 465, 41 S. Ct., 574, 576, 65 L. Ed., 1048, 13 A. L. R., 1159, that evidence so obtained by an individual in no way connected with the government did not violate the 4th Amendment. After approving the Gouled and like cases, the court said:

"In the present case the record clearly shows that no official of the federal government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after

the property had been taken from him and was in the possession of the Cities Service Company. . . .

"The papers having come into the possession of the government without a violation of petitioner's rights by governmental authority, we see no reason why the fact that individuals, unconnected with the government, may have wrongfully taken them, should prevent them from being held for use in prosecuting an offense where the documents are of an incriminatory character."

Justices BRANDEIS and HOLMES delivered a very vigorous dissenting opinion in that case.

In *Silverthorne Lumber Co.* v. *United States*, 251 U. S., 385, 40 S. Ct., 182, 64 L. Ed., 319, 24 A. L. R., 1426, certain agents of the Department of Justice entered the office of the Lumber Company and seized papers belonging to it to be used 'as evidence against it in a criminal prosecution. In excluding the evidence this obtained, the court said: "Thus the case is not that of knowledge acquired through the wrongful act of a stranger, but it must be assumed that the Government planned or at all events ratified the whole performance."

In considering the admissibility of this character of evidence the Supreme Court of Montana, in *State ex rel. Sadler* v. *District Court et al.*, 70 Mont., 378, 389, 390, 225 P., 1000, 1003, said:

"While it is true that the constitutional provisions relied upon can only be invoked in this way to protect a citizen against the activities of the government, it is only when persons are acting under color of authority from the government that evidence developed in violation of the law can be at all rejected (*Hughes* v. *State,* 145 Tenn., 544, 238 S. W., 588, 20 A. L. R., 639); yet in this case the facts show that Whittaker and Larson, though not peace officers, were employed by the county attorney of

Cascade county to obtain evidence to be used in the prosecution of violations of the prohibition law and were acting under his orders, and as soon as they obtained the articles in question they delivered them to the county attorney. He could not authorize or empower them to do what he or any peace officer of the state had no lawful power or authority to do; and the county attorney could not make Whittaker and Larson his agents, and then claim that the illegality was their act, and not the act of the state. *United States* v. *Bush* (D. C.), 269 F., 455; *State* v. *Wills, supra* [91 W. Va., 659, 114 S. E., 261, 24 A. L. R., 1398]; *United States* v. *Falloco* (D. C.), 277 F., 75. To hold otherwise would confer more authority and greater powers upon the operatives of the county attorney than are possessed by the duly constituted officers of the state.''

The incompetency of evidence obtained as a result of trespassing upon private property was sustained in the recent case of *Lucarini* v. *State,* 159 Tenn., 373, 19 S. W. (2d), 239.

The principle underlying the foregoing decisions is that the government by relying upon an unlawful act of its agent or representative thereby ratifies what has been done.

If we are to have a government by law it is essential that this constitutional guaranty be liberally construed in favor of the individual.

In *Gouled* v. *United States, supra,* it is said:

''It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in *Boyd* v. *United States,* 116 U. S., 616, 6 S. Ct., 524, 29 L. Ed., 746, in *Weeks* v. *United States,* 232 U. S., 383, 34 S. Ct., 341, 58 L. Ed., 652, L. R. A., 1915B, 834, Ann. Cas., 1915C, 1177, and in *Silverthorne Lumber Co.* v. *United*

*States,* 251 U. S., 385, 40 S. Ct., 182, 64 L. Ed., 319 [24 A. L. R., 1426]) have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two amendments. The effect of the decisions cited is: That such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property;' that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen—the right to trial by jury, to the writ of habeas corpus, and to due process of law. It has been repeatedly decided that these amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous, executive officers.''

In *Craven* v. *State,* 148 Tenn., 517, 519, 520, 256 S. W., 431, 432, this court, speaking through Chief Justice GREEN, gave the historical background of our law regulating searches and seizures and, with respect to an adherence thereto, said:

''At the very foundation of our state is the right of the people to be secure in their persons, houses, papers, and possessions. Infringement of such individual rights cannot be tolerated until we tire of democracy and are ready for communism or a despotism. The enforcement of no statute is of sufficient importance to justify indifference to the basic principles of our government.''

This mandate of the Constitution is ''not addressed alone to the legislature, but indeed to every offi-

cer of the jurisdiction, including the judiciary." 56 C. J., 1157.

With respect to complying with our search and seizure statutes Justice Cook, in *Hampton* v. *State,* 148 Tenn., 155, 161, 252 S. W., 1007, 1008, made this very pertinent observation:

"The requirements of the Constitution and the statutes we have quoted are not difficult. It would be easy to comply with them, and compliance would result in protecting the innocent from unlawful search, and authorize the use of evidence obtained through lawful search against the guilty."

If these patrolmen had reliable information that "Little Peabody" was a club where gambling was engaged in they could easily have secured the issuance of a search warrant and a warrant for the arrest of the defendants and had both executed, and thereby conformed to the procedure provided by law. This club had been in operation for six months, and in view of the ample provisions made for the issuance and service of search warrants and warrants of arrest, there was no danger of the administration of the criminal laws of the State suffering had these patrolmen followed the statutory practice instead of taking the law into their own hands. They were, however, evidently proceeding upon the erroneous assumption, as testified to by West, that they did not need a search warrant to make the raiding of this club legal.

The State introduced no proof whatsoever tending to prove that "Little Peabody" was a place to which the public was invited, while on the other hand the uncontradicted proof shows that it was a private club. This may be a subterfuge, but the record does not establish that fact.

For the reasons stated we hold that these patrolmen were officers, agents, and representatives of the State, were acting in their official capacity and not as individuals, and that their testimony, upon being excepted to, should have been excluded.

We find it unnecessary to discuss the other assignments of error further than to state that they contain no merit and are overruled.

We, therefore, feel constrained to reverse the judgment of the trial court and remand the case for a new trial.