STATE of Tennessee, Appellee,

v.

Edmund George ZAGORSKI, Appellant.

Supreme Court of Tennessee,

at Nashville.

Nov. 25, 1985.

James E. Walton, Larry D. Wilks, Springfield, for appellant.

Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, for appellee, W.J. Michael Cody, Atty. Gen. and Reporter, of counsel.

## OPINION

COOPER, Chief Justice.

The defendant, Edmund George Zagorski, has appealed his convictions for murder in the first degree for the killing of John Dale Dotson and Jimmy Porter, and the resulting two sentences of death. He questions the sufficiency of the convicting evidence and the evidence supporting the aggravating circumstances found by the jury, and rulings by the trial court on pretrial motions, on voir dire, on the admission of evidence, and on objections to argument by the state in the sentencing phase of the trial. Defendant also insists that the Tennessee Death Penalty Act is unconstitutional.

After consideration of the several issues and of the entire record, we are of the opinion that no reversible error was committed in the trial, that the verdicts and sentences are sustained by the evidence, and that the sentences of death under the

circumstances of this case are in no way arbitrary or disproportionate. We therefore affirm the convictions and the sentences of death.

The evidence shows that on April 5, 1983, the defendant first appeared at the Lakeland Trout farm in Bucksnort in Hickman County, Tennessee. The Trout Farm was managed by defendant's friend, Jimmy Blackwell. The defendant, calling himself "Jesse Lee Hardin," claimed to have been working as a mercenary in Honduras and El Salvador. He was wearing camouflage clothing, and was carrying a survival knife, an HK 91 .308 semi-automatic rifle and other weapons and survival gear. Although he claimed to have made as much as $100.00 a day as a mercenary, defendant did not seem to have any money.

During his stay at the trout farm, defendant met John Dale Dotson and his wife Marsha. Dotson and defendant arranged a marijuana purchase involving them and a third man, Jimmy Porter, who lived in nearby Dickson, Tennessee. According to Marsha Dotson, Porter was to pay $23,000.00 for one hundred pounds of marijuana defendant would arrange to have dropped from an airplane into the woods. Dotson was to receive $10,000.00 from Porter for his part of the deal. (Zagorski in a statement to investigating officers stated that the sale was to be of 200 pounds of marijuana at $150.00 per pound). The date of the transaction was to be April 23, 1983.

At about midnight, on April 21, 1983, an airplane flew very low over the Trout Farm. Zagorski, who was with Blackwell, commented "It's here," and left. Zagorski later told Dotson the marijuana had arrived and was in the woods with a man called Dave; that Dotson and no more than two other men were to meet Zagorski, who would be on foot, at 6:00 p.m. at Spot, Tennessee, which was within walking distance of the Trout Farm. Zagorski also told Dotson to come armed.

On the afternoon of April 23, 1983, Porter and Dotson were together at the Eastside Tavern in Dickson, Tennessee. There Porter showed the tavern operator a bank bag containing cash and a .357 Magnum pistol. Dotson and Porter left the tavern in Porter's red Datsun pick-up at about 4:30 p.m. They were never seen alive again.

Also on April 23, 1983, Zagorski left the trout farm, taking his gear. He had been heard to tell Dotson that he would meet him at 6:00 p.m. on the road "up behind Spot." At around 5:30 p.m., Blackwell and his girlfriend heard gunshots from the general area where the defendant had walked into the woods. According to Blackwell, it was not unusual to hear gunshots on a daily basis in that part of Hickman County because of the frequency of deer hunting in the area.

On May 6, 1983, the badly decomposed bodies of Porter and Dotson were discovered in a secluded, wooded area near I–65 in Robertson County. The men had been shot in the chest and abdomen and their throats had been cut.

A search of the area turned up a military snake-bite kit, a knife scabbard (later identified as Zagorski's), a case for "Red Specs" glasses (the type worn by Zagorski), six flares, three size "C" Duracel flashlight batteries and an ink pen. Officers also found a .308 cartridge on the ground between the bodies of the victims. Ballistic tests showed that the cartridge had been fired from Zagorski's HK 91 semi-automatic rifle.

An autopsy was performed on the bodies of the victims, but due to the advanced stage of decomposition, the time of death of the victims could not be fixed with any degree of certitude. The pathologist stated that the time of death could be any time from a week to a month prior to the time the autopsies were performed. The pathologist also testified that he could not determine whether the victims were shot or cut first, but that the actual cause of death of each of the victims was the gunshot wounds. According to the pathologist, neither Porter nor Dotson would have died immediately upon being shot, but they would have lived five to seven minutes. The record further shows that at the time

of death, Porter had a blood alcohol level of .10 and Dotson had a blood alcohol level of .25.

Johnny Baggett, who found the bodies, testified that a week to ten days before at around 7:00 or 8:00 p.m., he had heard gunshots in the area. When questioned closer about the gunshots, he fixed the time at around April 25 or 26, 1983.

At about that time, Zagorski showed up at the home of Rodney Bruce in Ironton, Ohio, driving Porter's Datson truck. He also had with him the deceased men's coveralls and Porter's .357 Magnum pistol. While in Ironton, Zagorski spent large sums of cash on survival gear, weapons, horses, a four-wheel drive pick-up, and a motorcycle. At one point he showed Bruce what he said was $25,000.00 in cash. He first claimed he had earned the money working off-shore and later said he had earned it working as a mercenary in South America. He also said he had made a "quick" $10,000.00 in Nashville. Zagorski also told Bruce and an army surplus dealer that he had lost his knife scabbard.

On May 26, 1983, Zagorski, armed and wearing a bullet-proof vest, was apprehended by Ohio law enforcement officers after a shoot-out in which Zagorski rammed a police car and shot a special deputy five times. Over $9,000.00 in cash was found in Zagorski's fatigue jacket and suit.

Zagorski gave different versions of his role in the killings of Dotson and Porter. When he spoke with police on June 1, 1983, he told them that he and another mercenary in their own vehicle had met Dotson and Porter near Spot. Two other mercenaries in a third vehicle had joined them as they drove up I-40. When they stopped on I-65 in Robertson County, the other mercenaries took Zagorski's rifle, silencer and gear and went into the woods with Dotson and Porter. Zagorski was instructed to drive Porter's pick-up to a Welcome Center at the Kentucky border and watch for law enforcement officers. Thirty to forty-five

minutes later the other mercenaries met him, gave him $5,000.00 and Porter's .357 Magnum and returned his rifle and gear. Zagorski then left in Porter's pick-up since, he said, it was not unusual to trade cars in a drug deal.

In statements made on July 27 and August 1, 1983, Zagorski claimed he was hired to kill Porter but that Dotson's death was a mistake. He also said that two other men had been hired to kill Porter, that the deaths occurred in Humphreys County and that the bodies were put in plastic bags and carried to Robertson County. Zagorski never admitted killing the men and refused to tell the identities of the other men he claimed were involved. Zagorski told some visitors at the jail that he had only been at the killings to "blow away" FBI agents.

The defense proof was directed toward showing that the killings did not occur in Robertson County. One witness, Ruby Winters, testified that at about 4:00 p.m. on April 23, 1983, she had heard loud music and four shots coming in a wooded area near Spot. Another witness testified as to how the HK 91 rifle fired and how far cartridges were expelled from the gun. This was in contradiction to testimony of state witnesses on the issue.

The jury found from the evidence that the defendant was guilty of murder in the first degree in killing John Dotson and Jimmy Porter. Implicit in the verdicts was a finding by the jury that the killings occurred in Robertson County, Tennessee. In a separate proceeding, and based upon the testimony introduced during the guilt phase of the trial, the jury imposed the sentence of death on the defendant for each killing on its finding (1) that the murders were committed by the defendant while he was engaged in committing robbery of the victims,[1] (2) that the murders were especially heinous, atrocious or cruel in that they involved torture or depravity of mind,[2] and (3) that there was no mitigating circumstance sufficiently substantial to

1. Tenn.Code Ann. § 39-2-203(i)(7)

2. Tenn.Code Ann. § 39-2-203(i)(5)

outweigh the statutory aggravating circumstances found by the jury.[3]

A number of issues that have a bearing on the overriding issue of the convicting evidence are raised by the defendant. The defendant insists the trial court committed prejudicial error in admitting in evidence statements given by the defendant to police officers. The defendant argues that he was questioned after having asked for an attorney and that he was coerced into making statements by the circumstances of his confinement and his physical and mental condition. We find no merit in these arguments.

The statements of Zagorski in question were those of June 1, July 27, and August 1, 1983. Zagorski consistently denied that he had killed the victims, but in each of the statements, though differing in details, Zagorski implicated himself in the killings. For example, in the June 1 statement, Zagorski placed the killing site in Robertson County and himself at the Kentucky-Tennessee border keeping a lookout for police authorities. The later statements had the victims meeting their death in Hickman County, with Zagorski present but not taking part in the killings.

Zagorski also talked with police officers on May 27, 1983. The statement was not used in the trial, but is important as Zagorski then stated he was not going "to make no statements or answer any question," and finally saying "[l]ike I said, I guess I really should talk to a lawyer."

Zagorski having asked for a lawyer, it becomes important to determine whether later statements were initiated by Zagorski and whether there was a knowing and intelligent waiver by him of his request for an attorney to be present at any interrogation. *See Smith v. Illinois,* 469 U.S. ——, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

With this in mind as we viewed the evidence, we concluded that the evidence supports the trial court's finding that the de-

fendant initiated the interrogations, that he was not subject to any coercive action on the part of the state, and that he knowingly and intelligently waived his right to have counsel present during the interrogations. Further, we are of the opinion that even if there had been an *Edwards* violation, error in admitting the statements in evidence was harmless beyond a reasonable doubt in view of the overwhelming evidence of guilt in this case. *See United States v. Webb,* 755 F.2d 382, 392 (5th Cir.1985) (applying harmless error analysis to *Edwards* violation).

Defendant also insists that the trial judge erred in failing to suppress physical evidence taken from the property of a private citizen in Ohio. The record shows that prior to the shoot-out with Ohio officers, defendant had been staying in a barn on property owned by Steven Boggs. On hearing of the shoot-out, Boggs telephoned the chief investigator of the Lawrence County, Ohio Sheriff's Department and told him that property belonging to the defendant was at the Boggs' place and that he was going to "get rid of" it unless someone came after it.

On responding to the telephone call, the investigator found that Boggs had removed the property from the barn where Zagorski had been staying and had placed it in the driveway. The investigator inventoried the property, which included the defendant's HK 91 .308 rifle, and seized it after giving Boggs a receipt. Defendant argues that the officer conducted an unlawful warrantless search and seizure of his property.

■ Fourth Amendment protection is inapplicable to a search or seizure effected by a private individual not acting as an agent of the government or with the participation or knowledge of any government official. *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1656–57, 80 L.Ed.2d 85 (1984); *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed.2d 1048 (1921); *Hughes v. State,* 176 Tenn. 330, 141 S.W.2d 477, 479 (1940). *See generally,* La-

---

**3.** Tenn.Code Ann. § 39–2–203(g)

Fave, *Search and Seizure,* § 1.6 (1978). The search and seizure of the defendant's personal property in this case was effected by a private individual with no connection to any government agency.

█ The defendant also insists the officers were required to obtain a warrant before testing the HK 91 rifle taken from the Boggs' property. Defendant argues that the testing was a significant expansion beyond the scope of the private search under *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), in which the majority of the Court set forth the standard that the legality of the governmental search must be tested by the scope of the antecedent private search. Under the analysis used in *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1661–1662, 80 L.Ed.2d 85 (1984), to determine the legality of a field test of suspected contraband discovered by a private search, the subsequent testing of Zagorski's rifle did not compromise any further legitimate interest in privacy on the part of the defendant and the testing was not a search under the Fourth Amendment.

In three separate issues the defendant argues that the prejudicial nature of the testimony of several witnesses concerning defendant's stay in Ohio and the circumstances of his capture outweighed the testimony's probative value on the issue of flight, and should therefore have been excluded. The trial court admitted evidence of Zagorski's spending sprees, his possession of the victim's property, and incriminating statements made by Zagorski while in Ohio. He also admitted evidence that defendant, at the time of his capture, had deliberately rammed a police car and opened fire on the officers inside, one of whom he shot five times, and of Zagorski's statement as he was handcuffed. It is this latter testimony that defendant primarily directs his argument of prejudice outweighing the probative value of the evidence.

█ A defendant's flight and attempts to evade arrest are relevant as circumstances from which, when considered with the other facts and circumstances in evidence, a jury can properly draw an inference of guilt. *Sotka v. State,* 503 S.W.2d 212, 221 (Tenn.Crim.App.1972). Circumstances surrounding a defendant's arrest, even though they may show the commission of another crime, are admissible if they have probative value in establishing guilt. *State v. Scott,* 687 S.W.2d 592, 593 (Mo.App.1985).

█ In admitting testimony concerning the shoot-out and arrest, the trial court instructed the State to limit testimony to those facts directly probative of the flight and showing defendant's desperation. The court also instructed the jury to consider the testimony only on the issue of flight. We see nothing in the record to indicate that either the State or the jury ignored the court's instructions. Further, we are of the opinion that the probative value of the testimony was not outweighed by any potentially prejudicial effects.

The defendant also contends that the trial court committed prejudicial error in admitting into evidence photographs of the victims as they were found lying in the woods. Defendant argues that there was no need for the photographs to be admitted in evidence in view of the testimony of the pathologist and the expressed willingness of defendant to stipulate to the fact that the victims were dead and to facts stated in the autopsy report. Defendant also insists that the prejudicial effect of the photographs outweighs their probative value.

█ The photographs in question are not gruesome or horrifying, though they show that the bodies are blackened from decomposition. Further, the photographs show more than the physiological causes of death, which is the primary import of the pathologist's testimony and the autopsy report. The photographs show the scene where the bodies were found and show the manner in which the bodies were lying and in which the clothing and personal items of the victims had been disturbed. This information is relevant to a resolution of the issues of venue, felony murder, premedita-

tion, and intent, all being issues material to a decision in this case.

■ The defendant also takes issue with the exclusion by the trial judge of the testimony of Marsha Dotson and former Sheriff Atkinson giving their opinion as to where the killings occurred. In both instances the trial judge properly sustained the State's objections to this testimony, since defendant was seeking opinion testimony from lay witnesses on an ultimate issue of fact which the jurors were as competent as the witnesses to determine. *See State v. Workman,* 667 S.W.2d 44, 51 (Tenn.1984).

■ On considering the evidence properly before the jury in this case, we are convinced that it is sufficient for a rational trial of fact to find beyond a reasonable doubt that the defendant killed John Dotson and Jimmy Porter in Robertson County during the course of a robbery. We are also of the opinion that the finding by the jury that the murders were "especially heinous, atrocious or cruel" is in accord with the evidence. *See State v. Williams,* 690 S.W.2d 517, 529–30 (Tenn.1985). Although the victims died from gunshot wounds, the defendant also slit their throats, leaving them to bleed to death in the woods. This evinces depravity of mind and is a form of torture. Defendant's actions were an infliction of gratuitous violence, and needless mutiliation of victims who were already helpless from fatal wounds which indicate a depraved state of mind at the time of the killings. We are also of the opinion that the evidence justifies the jury's finding that there was no mitigating circumstance which would outweigh the statutory aggravating circumstances found by the jury.

Further, we find that the death penalty is not disproportionate to the penalty imposed in similar cases of first degree murder where the victim was robbed while armed. *State v. Laney,* 654 S.W.2d 383 (Tenn.1983); or drinking, *State v. Campbell,* 664 S.W.2d 281 (Tenn.1984). *See also State v. Morris,* 641 S.W.2d 883 (Tenn. 1982) for a similar first degree murder by a defendant, who had gained his victim's trust, then killed and robbed him.

■ Defendant also raised a number of issues involving the *voir dire.* The record shows that the trial judge elected to have prospective jurors examined in groups of three and later six to speed up selection. Whenever any juror indicated he had been exposed to publicity, formed an opinion, or possessed potentially prejudicial knowledge or information, he was examined separately. Defendant insists that the limited group examination of jurors was improper that there should have been individual *voir dire,* that two jurors were improperly excused for cause, citing *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and that comments and questions by the trial court and the prosecutor during *voir dire* were contra to later jury instructions and misled the jury. We have carefully considered each of the contentions and have found them to be without merit. No prejudice could or did result from examining prospective jurors in small, controlled groups in the manner described above. The two jurors excused for cause made it clear that they would vote against the imposition of the death penalty, no matter what the circumstances of the case were, which is what *Witherspoon* requires for juror disqualification. We have read the examination of prospective jurors by the court and the prosecution, of which the defendant complains, and find nothing misleading or improper in the questions. The questions and comments were part of ascertaining if jurors could accept the law's mandate that both life and death are appropriate punishments for first degree murder, depending on the circumstances proven. None of the comments or questions could have prejudiced the defendant.

■ Defendant also insists that he was entitled to two separate juries, one to decide guilt, the other sentence, on the theory that a so-called "death qualified" jury is skewed toward a finding of guilt, contravening the defendant's right to a fair and impartial jury composed of the cross-section of the community. This theory was

rejected in *State v. McKay*, 680 S.W.2d 447, 450, 453–455 (Tenn.1984), and we find no basis in the record to change our view of the theory.

During *voir dire*, Mrs. Dotson and Mrs. Porter were allowed to be present in the courtroom despite defendant's request they be excluded. There is no indication in the record that their presence was disruptive or affected the jurors. They heard no testimony, and there is no showing that statements by the parties as to their theories of the case affected either woman's testimony. Exclusion of witnesses from the courtroom is a decision within the discretion of the trial judge which will not be reversed absent an abuse of discretion to the prejudice of the complaining party. *State v. Henderson*, 220 Tenn. 701, 423 S.W.2d 489, 491 (1968); *Nance v. State*, 210 Tenn. 328, 358 S.W.2d 327, 330 (1962). No such abuse of discretion is shown in this case.

Next, defendant contends that Assistant District Attorney General Gay should have been disqualified from participating in the trial as it was obvious that he was a potential witness (DR 5–102), having participated in the June 1 interrogation, and had made pre-trial statements to the media concerning the evidence in the case contrary to Disciplinary Rule 7–107(B)(3) and (6). There was no violation of DR 5–102. The State informed the trial court that it did not need to or intend to call Gay as a witness, and he was not called. While some statements made by Gay to the media may have bordered on a violation of DR 7–107(B), recusal from participation in the trial is not a necessary discipline, and failure to disqualify Gay did not prejudice the defendant in any manner.

The defendant also insists that the trial judge should have ordered a change in venue, citing pre-trial publicity and resulting excitement in the community. The matter of a change of venue addresses itself to the sound judicial discretion of the trial judge and his decision must be respected absent a showing of abuse of discretion. *Rippy v. State*, 550 S.W.2d 636, 638 (Tenn.1977). No abuse of discretion is shown in this case, nor could there be any prejudice as shown by the *voir dire* and from the procedure that permitted individual voir dire whenever it was determined that a juror had been exposed to pre-trial publicity.

The defendant insists that the trial court erred in the sentencing phase of the trial in refusing to give requested instructions on mitigating circumstances and in refusing to allow the defendant to argue in mitigation of punishment the victims' participation in a drug deal, defendant's lack of a prior record of violent criminal activity and the defendant's youth as mitigating circumstances.

The circumstances set forth in the requested instructions were not in accord with the evidence,[4] nor were they included in the specifically delineated statutory mitigating circumstances, Tenn.Code Ann. § 39–2–203(j). The jury could consider them under the "catchall" provision in the statute which directs them to consider "any mitigating circumstances which shall include, but not be limited [to circumstances set out in the statute]." Tenn.Code Ann. § 39–2–203(j). The court therefore instructed the jury that

> Mitigating circumstances are within your province, if there are any. You have heard the evidence of the case, and no additional evidence was produced at the sentencing hearing, so you may consider all the evidence that was presented in the entire case. The law sets out certain mitigating circumstances which have no particular applicability in this case, *but you're not limited to those, so you can consider any mitigating circumstances that in your judgment would comply*

4. No evidence was submitted to the jury to show defendant's prior criminal record. An exhibit to the transcript of Preliminary Motions shows defendant's criminal activities, which consists primarily of drug related offenses. Also, there was no proof of defendant's age, although statements outside the jury's presence indicate defendant was twenty-eight years old.

*with the instructions given.* [emphasis supplied]

No limitation was placed on argument by defense counsel. To the contrary, the trial judge in a colloquy with counsel for the State and the defense, stated:

> ... *I'm going to give the defense great leeway as to whether or not they would go far afield.* You would feel free to object. It would not be discourteous, and I'd rule on it at that time, *but I do not want to limit them in their argument in a case like this.* [emphasis supplied]

Under these circumstances, we find no error in the trial court's rulings on scope of argument of counsel or in the court's instructions to the jury in the sentencing phase of the trial.

■■■ In other issues directed to the sentencing phase of the trial, the defendant challenges the constitutionality of the death penalty statute, the fact that the sentencing hearing began late in the afternoon of the fifth day of trial, and the State's closing argument. We find no merit in these issues.

The several bases of defendant's challenge to the constitutionality of the Tennessee Death Penalty Act have been considered and rejected in other cases decided by this court. The argument that the death penalty is cruel and unusual punishment was considered and rejected in *State v. Dicks,* 615 S.W.2d 126 (Tenn.1981). The contention that the underlying felony may not be used as an aggravating circumstance was rejected in *State v. Pritchett,* 621 S.W.2d 127, 140–141 (Tenn.1981). Likewise found to be without merit was the argument that the statute fails to specify which party bears the burden of proof of establishing that aggravating circumstances out weigh mitigating circumstances or to provide a standard of proof for making this determination. *State v. Teague,* 680 S.W.2d 785, 790 (Tenn.1984). The defendant also contends that Tenn.Code Ann. § 39–2–203(i)(5), ("the murder was especially heinous, atrocious or cruel") is unconstitutionally vague. This argument was made and rejected in *State v. Pritchett,* 621 S.W.2d 127, 139.

Defendant insists that he was prejudiced by the fact that the sentencing hearing began late in the day, arguing that the court, counsel and jury were exhausted. There is nothing in the record to indicate this fact, and we note that defense counsel did not voice his concerns to the court at the time of the sentencing hearing.

As to the closing argument of the prosecution, no objection was made by counsel at the time of argument. However, we have considered each statement of the district attorney general in context, and find that they are within the bounds of propriety and in accord with the evidence, and that the arguments did not prejudice the defendant or deprive him of any rights.

The defendant's convictions of first degree murder and the sentences of death are affirmed. The death sentences will be carried out as provided by law on March 12, 1986, unless stayed by appropriate authority. Costs are adjudged against the defendant.

I am authorized to state that Mr. Justice Brock concurs in the affirmance of conviction but dissents from the imposition of the death penalty for the reasons expressed in his dissent in *State of Tennessee v. Dicks,* 615 S.W.2d 126, 132 (Tenn.1981).

FONES, HARBISON and DROWOTA, JJ., concur.

BROCK, J., dissents.