# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 22, 2000 Session

## STATE OF TENNESSEE v. PAUL ANDREW THOMPSON

**Appeal from the Criminal Court for Hancock County**
**No. 2194     James E. Beckner, Judge**

---

**No. E2000-01224-CCA-R3-CD**
**October 12, 2000**

---

The defendant appeals his conviction for first degree murder and sentence of life imprisonment without parole, contending (1) that the evidence was insufficient to establish premeditation, (2) that the testimony of Kimberly Johnson, the victim's ex-stepdaughter, was improperly excluded, and (3) that the evidence was insufficient to establish the aggravating circumstance of mutilation of the body. We affirm the defendant's conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, attorney for appellant, Paul Andrew Thompson.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and G. Douglas Godbee, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Paul Andrew Thompson, appeals as of right his conviction by a jury for first degree murder, for which the jury sentenced him to life imprisonment without the possibility of parole. The defendant contends (1) that the evidence was insufficient to establish premeditation, (2) that the testimony of Kimberly Johnson, the victim's ex-stepdaughter, was improperly excluded, and (3) that the evidence was insufficient to establish mutilation of the body, the only aggravating circumstance upon which the sentence of life without the possibility of parole was based.

At trial, Lieutenant Phillip Johnson, with the Claiborne County Sheriff's Department, testified as follows: On February 25, 1998, he went to Clinch River Road to investigate a truck that was in the river. The front of a red and silver F-350 pickup truck was lodged against a tree in the river. The truck was a king cab and had back doors. He and the other investigators saw a human

elbow protruding from underneath a tarpaulin in the truck bed. When he removed the tarpaulin, he saw the body of a white male, who was later identified as Jacob Schreffler. A ratchet strap was around the victim's mid-section, and the body was covered with dirt and sawdust. The victim had four stab wounds and a round hole in his back, which appeared to be a bullet hole. His throat was cut from one ear to his chin. The victim's legs, knees, and forehead were cut. He had a large hole in the center of his chest, and his right leg appeared to be broken.

Johnson stated that he found a bolt-action shotgun inside the truck but that the bolt was missing. The Tennessee Bureau of Investigation (TBI) Crime Lab searched the truck for evidence. Johnson and Michael Vinsant, a TBI special agent, matched the truck's license plate number to the victim, who had a Hancock County address. Johnson then spoke with Hancock County Sheriff's Department Officer Steve Bryant, who told him that the victim had been missing for several days and was last seen with the defendant and the defendant's wife, Pam Thompson. Johnson and Vinsant went to the defendant's house, but no one was there. The next morning, Johnson went to the school that the defendant's children attended and learned that the defendant and his wife were at the Villa Motel. When he went to the defendant's motel room, the defendant said that he was just going to see Johnson. Johnson read the defendant his <u>Miranda</u> rights, and the defendant said that it was in self-defense and that he had to do it.

Agent Steve Vinsant testified as follows: He examined the body of the victim at Claiborne County Hospital. The body had a large cut on the head, a large hole in the chest, and a small hole and stab wounds in the back. The x-ray of the torso revealed numerous white specks which were particles of metal from a bullet.

Vinsant stated that when the defendant was taken into custody, he indicated that he wanted to make a statement. Vinsant read the defendant his <u>Miranda</u> rights, and the defendant signed a waiver. The defendant stated, "I had to do it. Jake's a big man. He was slinging me around like a rag doll." The defendant did not mention his daughter.

Vinsant testified that the defendant's wife consented to a search of their residence. During the search, Vinsant recovered a photograph of the defendant holding a high-powered rifle. He also noticed a burned area in the driveway, near which he found and collected samples of soil and gravel which were reddish brown and appeared to be stained with blood. He also collected samples of tarpaulin fibers from the same area. All of the evidence was sent to the TBI crime lab. The tests on the soil samples revealed that the reddish brown material was human blood with the victim's DNA. The tests on the tarpaulin fibers revealed that the fibers were consistent with the tarpaulin in which the victim's body had been wrapped.

Vinsant stated that Investigator Teddy Collingsworth of the District Attorney General's Office recovered a high-powered rifle several days later and that it was sent to the crime lab for testing. Also, Vinsant recovered the bullet that was removed from the victim's body during the autopsy, and ballistics testing showed that the bullet was fired from the same rifle.

Hancock County Sheriff's Investigator Steve Bryant testified as follows: He collected samples of red spots and hair from the defendant's driveway. He also recovered a Marlboro pack that had red spots on it. He gave this evidence to the TBI. He also noticed ashes in the driveway and found two dually truck tire tracks in the ashes.

John Cook, a neighbor of the defendant and of the victim, testified as follows: He last saw the defendant in the afternoon of February 22, 1998, walking with his daughter toward the victim's house. He heard gunshots later that afternoon, but none sounded as if they came from a high-powered rifle. The next day, Fran Styles, a friend of the victim, called him and said that she had been unable to contact the victim. Styles asked him to look for the victim. Cook went to the victim's house but did not find him. As he was returning home, he noticed tire tracks from the victim's truck in the defendant's driveway. The following day, February 24, 1998, Cook went to the defendant's house, and the defendant's wife told him that the defendant was working out of town. Cook also testified that the defendant usually smoked Marlboro cigarettes.

Dr. Cleland Blake, a physician and forensic pathologist, testified as follows: On February 26, 1998, he performed an autopsy on the victim. The victim's body had a gunshot wound in the back; a two and one-half inch hole in the chest; a major cut across the forehead caused by a heavy, sharp edge; a superficial cut about six inches long across the neck; four stab wounds in the back; fractures of both legs caused by heavy pressure exerted from the back as if the body had been run over by a car; multiple scratch abrasions; scrape abrasions on the face, the nose, and the forehead; and scrape abrasions on the legs from being dragged. The bullet entered the back, destroying the vertebral column and completely cutting the spinal cord, traveled through a lung and the heart, and stopped just under the skin of the chest. The bullet was a .25 caliber, talon bullet, which has sharp petals that tear tissue as it travels through the body. The cut on the forehead went through the bone and damaged the brain. The hole in the chest was caused by a logging peavey, which went through the ribs, through the surface of the lungs, through the heart, through the diaphragm, and into the stomach and colon. Most of the injuries were inflicted after the victim had died, including the cut across the forehead, the cut across the neck, the leg fractures, the leg scrapes, and the stab wounds in the back. The toxicology tests revealed that the victim had ingested ethyl alcohol, cocaine, and norpropoxyphene shortly before his death.

Investigator Teddy Collingsworth, from the Hancock County District Attorney's Office, testified that on February 26, 1998, he photographed the defendant's body, which had no noticeable, large injuries. The next day, after the defendant waived his Miranda rights, the defendant made the following statement:

> I stopped near where I ran the truck off the road at Clinch River and threwed the 257 Roberts rifle, knife, axe, clothes, board, chunk of wood two and a half feet long. I bought two boxes of shells a long time ago. The rifle was in a hard case. I don't want to make any other statements.

Collingsworth said that on March 2, 1998, he recovered a .257 caliber rifle in a hard case from a car at Bobby Powell's home. Later during the investigation, he recovered a logging peavey from the victim's tool shed.

The defendant testified as follows: On February 22, 1998, he and his daughter went to the victim's house. Richard Maloney, a friend of the defendant and of the victim, and his son were already at the victim's house. The three men drank alcohol and shot guns, while the two children played. About thirty minutes after Maloney and his son left, the defendant's daughter left and walked back home. A little later, he started to walk home, but the victim drove next to him and insisted on giving him a ride. The victim drove the defendant to his house, but as the victim was leaving, he backed the truck into the house. The defendant went inside the house to see if anything had been damaged, and then he went back outside to find something with which he could patch the hole. He covered the hole with a piece of tarpaulin and some tape. When he went back inside, his seven-year-old daughter was very upset and said that the victim had put something in her bottom. The defendant looked at her bottom and noticed that it was red and swollen and that her panties had blood on them. He went outside and confronted the victim, which led to a physical altercation. After a brief fight, the victim walked to his truck, reached into the back door, and drew a rifle. When the defendant saw the butt of the rifle, he shot the victim. The defendant stated that he did not remember doing anything else to the body.

On cross-examination, the defendant admitted that he knew that the gun found in the back of the truck could not have been fired because it did not have a bolt. He also stated that he gave his gun to Robert Powell and asked him to hold it. The defendant testified that his wife had rented another house and that his children were registered for school in a jurisdiction other than the one where he resided. The defendant, however, denied that his wife was leaving him. The defendant also said that he did not see the victim hug or touch his wife.

The defendant's daughter testified as follows: On February 22, 1998, she went with her father, the defendant, to the victim's house. She went behind the tool shed and as she was relieving herself, she felt a hard sting in her bottom. She pulled up her pants, turned around, and saw the victim. The victim told her not to tell anybody. She went to her father and said that she wanted to leave, and her father told her to walk home. When she got home, she went to bed. Sometime later, there was a bang on her bedroom wall. She ran outside and saw that the victim's truck had crashed into the house. When her father came inside, she told him that the victim had touched her, and she showed him the blood on her panties.

Dr. Mike Buckner, the defendant's psychologist, testified as follows: He had seen the defendant eleven times since April 16, 1998, and diagnosed the defendant as having post-traumatic stress disorder and single-episode depression. He stated that the defendant, as is common with post-traumatic stress disorder, had some memory loss of the events surrounding the murder. In his opinion, within a reasonable degree of psychological certainty, the defendant could not have formed the intent to commit murder. On cross-examination, he stated that if the information that the defendant provided was false, then his diagnosis would be flawed.

Michael Cohan, the defendant's private investigator, testified that he investigated the victim's residence. He stated that there were five children's bicycles and a sled behind the victim's tool shed.

The state called three rebuttal witnesses: Teddy Collingsworth, Richard Maloney, and Teresa White. Collingsworth testified that he talked to the defendant's daughter the day after the victim's body was found and that she made the following statement:

[O]n Sunday I went with my daddy to Jake's house where they shot a gun. Richard and Matthew were there. Jake backed his truck into our house. This was about dark. Daddy was drinking beer. Jake never touched me on my privates. Mommy said daddy shot a deer that night. I heard two gun shots. Then when I got up the next morning, Jake was gone with his truck. I haven't seen him since.

Richard Maloney, a neighbor of the defendant and victim, testified as follows: He last saw the victim at the victim's house on February 22, 1998. The defendant and his daughter were also at the victim's house. He and the defendant saw a gun in the back of the victim's truck, but the gun was missing the bolt that ejects the cartridge. He testified that the defendant said that he would like to shoot the gun when the bolt was fixed. He said that when the defendant's wife drove by the victim's house, the defendant called her a derogatory name and made a gesture with his hand as though shooting her with a gun.

Teresa White, an ex-neighbor of the defendant, testified that her daughter invited the defendant's daughter to spend the night at her house on March 19, 1998. During the night, the defendant's daughter started crying and told her the following: She did not want her father to get out of jail. When the victim was at her home, her parents had gotten into a fight. Her father hit her mother, and the victim said to her father that if he had a wife like that, he would not hit her. Her father accused the victim of doing something with his wife, and as the victim was leaving the house, her father shot him. Her father buried the body in the back yard, but dug it up because he was afraid that it would be found. He then cut up the body, placed it in a plastic bag, and dumped it in the Clinch River. The defendant's daughter also told White that there was blood all over the house and that she, her brother, and her mother cleaned it up.

## I. SUFFICIENCY OF THE EVIDENCE

On appeal, the defendant contends that the evidence is insufficient to show premeditation on his part. The defendant asserts that there is no substantive proof of premeditation, that the only proof of premeditation was impeachment evidence, that he lacked the culpable mental state to form intent, and that the state's theory in rebuttal closing argument supports only a conviction for voluntary manslaughter. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson

v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

First degree premeditated murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Further, "premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has stated that the following circumstances are demonstrative of the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

The evidence, not including evidence introduced for impeachment purposes, in the light most favorable to the state reveals that after a day of shooting guns and drinking, the victim drove the defendant home. The defendant had a motive to kill the victim either because of his marital problems or because of his daughter's statement. The defendant acted upon his motive by obtaining a high-powered rifle while the victim was at his house and shooting the unarmed victim in the back. The defendant then wrapped the victim's body in a tarpaulin, placed it in the bed of the victim's truck, and drove the truck into a river. The defendant gave the gun to a friend, who hid it under a car, and disposed of the other weapons by throwing them into the river. The defendant then hid in a motel room until he was located by the police. The evidence viewed in this light reveals that the defendant had a motive to kill the victim, that he procured a deadly weapon, that he shot an unarmed victim in the back, and that the defendant calmly tried to conceal the crime. A rational jury could have found beyond a reasonable doubt based upon reasonable inferences from these circumstances that the defendant was sufficiently free from excitement and passion to premeditate the murder.

The defendant also contends that the evidence was insufficient to establish intent, arguing that Dr. Buckner presented uncontradicted testimony that the defendant could not have formed the intent to commit murder. However, this testimony was not uncontradicted. Dr. Buckner admitted that his diagnosis could be flawed if the defendant had not told him the truth. However, we must presume again that the jury resolved the conflicting testimony in the state's favor. In viewing all of

the evidence in the light most favorable to the state, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the defendant intentionally killed the victim.

Finally, the defendant contends that the state's closing argument shows an absence of premeditation. The defendant asserts that the state's argument supports only a verdict of voluntary manslaughter and not one of murder. The state argued:

> I, ladies and gentlemen, submit to you that he went into a jealous rage, that he thought for some reason. He knew Pam was leaving him. She put her kids in another school. Rented another house. She goes by, this is Sunday right before it happens, you know b-i-t-c-h. He gets over there, he sees Jake do something, say something to her and he goes into a rage; and he militates [sic] this body. Not because of what he says Jake did to [his daughter]. He militates [sic] his body as a message to his family, to his wife. Don't leave me. Don't mess with other people. This is what's going to happen.

First, a rational jury could infer premeditation from this argument, considering it along with all of the evidence presented in the case. Second, this argument was one of a couple of theories presented by the state in its closing. The state undoubtedly knew that the jury would be charged with the lesser included offense of voluntary manslaughter. Even if this argument supported voluntary manslaughter, it is not error to present alternative theories supporting the different offenses to be charged to the jury. The jury was entitled to reject this theory in favor of another. Finally, and most importantly, this was argument, not evidence. The jury was instructed accordingly. The jury could have completely ignored this argument in reaching a verdict based upon the evidence. We conclude that the state's argument does not render the evidence insufficient to show premeditation.

## II. SURREBUTTAL TESTIMONY

The defendant contends that the trial court erred in not allowing him to introduce the surrebuttal testimony of Kimberly Johnson, the victim's ex-stepdaughter. At the close of the state's rebuttal evidence, the defendant asked to call Johnson. The defendant asserted that Johnson would testify that approximately nine years ago, the victim was convicted of assaulting her and that on another occasion the victim entered her bedroom and fondled her. The trial court ruled that this testimony was not proper surrebuttal evidence because it did not specifically answer the state's rebuttal evidence.

Rebuttal evidence is "any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused." Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979). The state is given the right of rebuttal because it "does not and cannot know what evidence the defense will use until it is presented at trial." State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266, Davidson County, slip op. at 9 (Tenn. Crim. App. Nov. 15, 1995) (citation omitted). Following the state's rebuttal, the defendant is entitled to present surrebuttal evidence to explain, contradict, or directly reply to the state's rebuttal evidence. See State v. Evans,

710 S.W.2d 530, 535 (Tenn. Crim. App. 1985) (holding that surrebuttal testimony was improper because it did not contradict the state's rebuttal testimony). Because there must be "'an end to the calling of witnesses at some time' . . . as well as 'a limit to [the evidence received in] rebuttal and surrebuttal,'" questions regarding the admissibility of rebuttal and surrebuttal evidence are left to the sound discretion of the trial court. State v. Scott, 735 S.W.2d 825, 828 (Tenn. Crim. App. 1987) (citations omitted). The trial court's decision will only be reversed upon a showing of a clear abuse of discretion. Id. (citation omitted).

First, the defendant argues that he should have been able to introduce Johnson's testimony because the trial court stated that it may have been relevant if it had been offered during the defendant's case-in-chief. The defendant relies on State v. Kendricks, 947 S.W.2d 875 (Tenn. Crim. App. 1996), in which the trial court allowed the state to introduce rebuttal testimony that should have been introduced in its case-in-chief. The defendant asserts that he should receive the same benefit in this case. First, we note that the trial court in the present case stated that Johnson's testimony may or may not have been relevant in the defendant's case-in-chief. Therefore, Johnson's testimony is unlike the testimony in Kendricks because it was not unquestionably relevant. Regardless, in Kendricks, this court did not hold that the state always has a right to present rebuttal evidence that should have been introduced in its case-in-chief. Accordingly, the defendant in the present case did not have a right to introduce surrebuttal evidence just because it may have been admissible in his case-in-chief.

The defendant also argues that even if he was not allowed to present Johnson's testimony as a matter of right, he should have been allowed to introduce it to contradict the testimony of the rebuttal witnesses. In the present case, the state presented three rebuttal witnesses: Teddy Collingsworth, Teresa White, and Richard Maloney. The defendant asserts that Johnson's testimony regarding being assaulted by the victim would have contradicted White's testimony, which implied that the victim was not the initial aggressor. He also argues that Johnson's testimony regarding the sexual assault by the victim would have contradicted the testimony of White and Collingsworth.

White was called to impeach the testimony of the defendant's daughter. She testified that the defendant's daughter told her that her father shot the victim after accusing him of having something to do with his wife. White also testified that the defendant's daughter told her that her father buried the victim, then dug him up, cut him up, and dumped him in the river. The version of the murder that the defendant's daughter told White contradicts the defendant's daughter's testimony, in which she alleged that the victim sexually assaulted her. Collingsworth was also called to impeach the testimony of the defendant's daughter, and he testified that the defendant's daughter told him that the victim never touched her private parts.

In refusing to allow Johnson's testimony, the trial court stated that surrebuttal is to answer specifically the state's rebuttal evidence and found that the proffered testimony was not within the scope of surrebuttal. Although we acknowledge that the testimony might have some relevance for contradicting the state's rebuttal proof, we view it to be marginally probative. We cannot say that the trial court abused its discretion in refusing to allow Johnson's testimony. Moreover, we doubt that

the testimony was admissible under Tenn. R. Evid. 404(b). Rule 404(b) states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admissible if it is offered to show identity, intent, or to rebut a claim of accident or mistake. See Tenn. R. Evid. 404(b), Advisory Commission Comment; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985).

In the present case, the defendant sought to introduce Johnson's testimony to show that the victim assaulted and sexually assaulted her. While this evidence arguably would have rehabilitated the defendant's daughter's credibility, it would have done so because it suggests that the victim had a propensity to be the initial aggressor and/or to sexually assault children. This is the type of evidence prohibited by 404(b).

### III. MUTILATION AS AN AGGRAVATING CIRCUMSTANCE

The defendant contends that the trial court should have dismissed mutilation of the body as an aggravating factor because no proof of mutilation existed. The defendant's argument rests upon his definition of mutilation. The defendant asserts that mutilation is limited to severance or destruction of a body part. The state argues that mutilation encompasses a broader range of behavior, including stabbing or cutting the body after death. We agree with the state.

Mutilation is not defined in our code. When words in statutes are not defined, they must be given their ordinary and natural meaning. See State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). In Webster's Third New International Dictionary, 1493 (1993), the verb "mutilate" is defined as: "1. to cut off or permanently destroy a limb or essential part . . . 2. to cut up or alter radically so as to make imperfect." Merriam-Webster's Collegiate Dictionary, 768 (10th ed. 1994), provides an identical definition of "mutilate," except that the primary and secondary definitions are reversed. This reversal is significant because only the first definition in Webster's (the second definition in Merriam-Webster's) supports the defendant's assertion that mutilate means to sever or destroy a body part. However, the second definition in Webster's (the first in Merriam-Webster's) supports the state's view that mutilate has a broader definition. We believe that the ordinary and natural meaning of mutilation, and the one that our General Assembly intended, is the broader definition.

This court has previously stated that the legislative intent underlying mutilation as an aggravating circumstance must be "that the General Assembly . . . meant to discourage corpse desecration." State v. David Eric Price, No. E1999-02684-CCA-R3-CD, Hamilton County, slip op. at 42 (Tenn. Crim. App. July 25, 2000). "Desecrate" is defined as: "1. To violate the sanctity of . . . . 2. to treat disrespectfully, irreverently, or outrageously." Merriam Webster's Collegiate Dictionary 312 (10th ed. 1994). Given the meaning of desecrate, this intent suggests a broader meaning than just severing or destroying a body part. However, a corpse can be desecrated in many ways without being mutilated, e.g., dumping a body in a river. Therefore, while this court's view of the legislative intent provides some guidance, it is not conclusive as to the intended definition of mutilation.

The manner in which the Tennessee Supreme Court has used the term "mutilation" also indicates that it views mutilation to have a broader definition than the one proposed by the defendant. In State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985), the court addressed the aggravating circumstance of the murder being especially heinous, atrocious, or cruel in a case in which the victims died from gunshot wounds but also had their throats cut. Zagorski, 701 S.W.2d at 814. No body parts were severed or destroyed. The court affirmed the finding of the aggravating circumstance, stating that the defendant needlessly mutilated the victims. Id.

In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the court used mutilation in a similar manner. In Smith, one of the three victims died from a gunshot wound, but the defendant, after the victim was dead, slashed her neck and stabbed her with a knife and an awl. Id. at 566. There was no allegation of body parts being severed or destroyed. After analyzing the aggravating circumstance of whether the murder was especially heinous, atrocious, or cruel, the court concluded that this circumstance was applicable because of "the multiplicity of the wounds, the infliction of gratuitous violence on the victims and their needless mutilation." Id. at 580. Using mutilation in this manner is consistent with the broader definition of mutilation.

We hold that mutilation as used in Tenn. Code Ann. § 39-13-204(i)(13) has a broader definition than just the destroying or severing of body parts. Mutilation also includes "to cut up or alter radically so as to make imperfect." See Browne v. State, 933 P. 2d 187, 193 & n.3 (Nev. 1997) (approving an instruction that mutilate means "to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect") (emphasis added).

We conclude that the trial court did not err in applying mutilation of the body as an aggravating factor. After the victim died, the defendant stabbed him four times in the back with a knife, slit his throat, cut his forehead and legs, and fractured both of his legs by exerting great pressure from behind. This evidence is sufficient to support the finding of mutilation of the body.

## IV. CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the defendant's conviction and sentence.

_____
JOSEPH M. TIPTON, JUDGE