IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2009 Session

**STATE OF TENNESSEE v. ANTONIO BIGSBEE**

**Direct Appeal from the Circuit Court for Robertson County**
**No. 06-0426    Michael R. Jones, Judge**

_____

**No. M2008-02514-CCA-R3-CD - Filed October 22, 2010**

_____

The appellant, Antonio Bigsbee, was convicted by a Robertson County Circuit Court Jury of especially aggravated kidnapping and reckless endangerment.  He received a total effective sentence of thirteen and one-half years in the Tennessee Department of Correction.  On appeal, the appellant contends that the evidence is not sufficient to support his convictions, that the trial court erred by allowing the State to present the testimony of a rebuttal witness, that the trial court erred in allowing the testimony of Robert Wayne Bell regarding a gun purchased by the appellant, and that the State's closing argument was improper.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are
Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Edward Swinger and Sam Coleman, Nashville, Tennessee (at trial), and Kate Dyer, Pleasant View, Tennessee (on appeal), for the appellant, Antonio Bigsbee.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The appellant was indicted for the attempted especially aggravated robbery, attempted first degree murder, and especially aggravated kidnapping of the victim, Brian England. Immediately prior to trial, the State dismissed the attempted especially aggravated robbery count and proceeded on the remaining two counts.

The State's first witness at trial, Jessica Elmore, testified that on June 14, 2006, she lived in E Building of the Southfield Apartments. She stated that the victim had spent the previous four nights at her apartment because he was too intoxicated to drive after "partying" at her sister's apartment in the G Building of Southfield Apartments.

Around 10:00 p.m. on the night of June 14, Nathan Holden, who was called "Big Nate," came to Elmore's apartment. He asked her to go to her sister's apartment and get England. He explained that he did not want to go to the apartment because someone with whom he did not "get along" was there. Elmore eventually agreed to Holden's request. Holden said he would wait outside her apartment.

Elmore went to her sister's apartment and told England that someone at her apartment wanted to see him. They left and walked to her apartment. Elmore did not see Holden outside her apartment, and she assumed he had gone back inside. Elmore tried to open her apartment door, but it was locked. While waiting for her friends to open the door, Elmore saw two men walk around the corner. The men were wearing dark clothes and masks "from the nose down." Elmore immediately recognized the appellant, whose nickname was "Dooney." When the second man turned, she saw his profile and recognized him as Jamelle Felts, whose nickname was "Scooter." Elmore said she had attended high school with both men.

Elmore saw the appellant holding a gun that resembled a hunting rifle. One of the men told Elmore to go into her apartment, then the men "nudged" England and instructed him to go with them. The men followed England around the corner, with the appellant pointing the gun toward England. Elmore saw them "fast-pace walking" toward England's car, which was parked in front of Elmore's sister's apartment.

Elmore saw her sister outside and told her to get Michael Babb, England's friend, who was in Elmore's sister's apartment. Babb came out and headed toward the appellant, Felts, and England. Elmore said the appellant and Felts had England "leaned over" in the front seat of his vehicle. Elmore went back to her apartment. As she was going in the door, she heard tires squealing and one gunshot. Holden was not inside her apartment when she returned.

Elmore said that police interviewed her that evening. She acknowledged she was not completely truthful in her first interview when she said that she did not know the gunmen and

that "Biggy" was the person who came to her apartment to find England. She said, however, that the rest of her description of events was truthful. A few hours later, Elmore gave a second statement to police. Again, Elmore truthfully recounted events but changed the names of the perpetrators involved. The next day, Elmore gave a third statement; her version of events was consistent with her earlier statements, but she finally revealed the identities of Holden, Felts, and the appellant as the perpetrators. She said that she did not reveal their identities earlier because she did not want to get anyone in trouble and because she had been threatened.

Elmore stated that Felts wore his hair in braids and had "a grill." She explained that "a grill" is a mouthful of gold teeth. She said the appellant did not have gold teeth, and he did not wear braids in his hair.

Brian England testified that on June 14, 2006, he and Babb were playing cards in the apartment of Babb's girlfriend, Crystal. He explained that Crystal and Jessica Elmore, his former girlfriend, were sisters. Elmore came into Crystal's apartment and told England that Nathan Holden wanted to talk with him. England went with Elmore to her apartment.

While standing outside Elmore's apartment, England saw two men approach from the breezeway. The men, who were dressed in black and had black bandanas covering their faces, appeared to have been hiding in the bushes. One of the men pointed a long gun "like a AK47 or a SK" at England's head, and they told England to go to his car. They stood behind England, grabbed his shirt, kept the gun pointed at his head, and would not let him turn around. England said that he did not get a good look at his assailants. However, he noticed that both assailants were African-American males. England was afraid that he would be shot and killed.

When England and his assailants reached his car, the assailants instructed him to get inside and move to the center of the front seat. The gunman told England to start the car, and England did so. The two assailants were standing outside of England's car when Babb came out and got their attention. The gunman pointed the gun at Babb, and England put the car in drive and "took off." England said the gunman fired two shots into the car, one of which came through the back windshield, grazed England's arm, and exited through the front windshield. England was unable to identify the gunman. He said that after he was inside the car, he was able to see that the gunman had braids.

England drove home and called Babb. Later, police came to England's house and convinced him to go to the hospital for treatment of his gunshot wound. England said that glass from the windshield was embedded in his skin.

Springfield Police Detective Ricky Morris testified that on June 14, 2006, he responded to a call at Southfield Apartments. At the scene, he was told that shots had been fired and that England had left the scene. Michael Babb was at the scene when Detective Morris arrived, and shortly thereafter, Babb received a call from England. Babb handed his cellular telephone to Detective Morris. England told Detective Morris that he had been hit by a bullet and that he was at home. Detective Morris spoke with witnesses and surveyed the crime scene. He found a spent shell casing near the area where England's car had been parked. The casing was for a "seven point six two by thirty-nine caliber" bullet, the type of ammunition commonly used in an "SKS or an AK type rifle."

After finding the casing, Detective Morris went to England's house. He saw bullet holes in both the back and front windshields of England's car. A bullet appeared to have entered from the back windshield of the car and exited the front windshield. When Detective Morris spoke with England, he saw that England had some cuts and bleeding on his left upper arm and shoulder consistent with the path of the bullet through the car.

Detective Morris recalled that he interviewed Elmore within thirty minutes of arriving at the crime scene. Elmore told him that "Biggy" came to her apartment looking for England. However, she did not identify anyone else. Detective Morris interviewed Elmore again in the early morning hours of June 15 because he believed she was withholding information. In Elmore's second statement, she identified the gunman as "Scooter," a white male who worked at Walmart. Upon discovering that Elmore had given false information about "Scooter," Detective Morris conducted a third interview during which she identified Holden, Felts, and the appellant as the perpetrators. Detective Morris said the only variations in Elmore's three statements were her identifications, or lack thereof, of the perpetrators.

A few days after the crime, Detective Morris arrested the appellant at his house. He was taken to the police station, and Detective Morris advised him of his Miranda rights. The appellant signed a waiver and agreed to an interview. The appellant initially denied any knowledge of the crime but ultimately gave the following statement:

> Last Wednesday night, the 14th of June, 2006, I was with Jamelle Felts, Scooter, and James N. Holden IV, Big Nate, at Southfield Apartments. Nate and Scooter came up with a plan to take Brian England to his grandmother's house and rob her. Big Nate asked for someone to go get England and when England came back, me and Scooter came out with masks and Scooter had my SKS rifle that I bought a month or so ago at the gun store in Springfield. Nate stayed in my car and me and

-4-

Scooter took England to his car with Scooter holding my gun on England.

When we got to England's car, England took off and Scooter shot once or twice at England as he drove off. I hid the gun in the empty house behind Hollywood's Car Wash and when we came back, the gun was gone and I don't know where it is now.

In response to questioning, the appellant said he "did it for the rush." Detective Morris looked for the gun but was unable to find it.

Detective Morris learned that the appellant was employed full-time, had graduated from high school, and was active in sports while in school. Detective Morris thought the appellant's involvement in the crime was "out of character" with his "track record."

Detective Morris said Felts gave a statement placing himself at the crime scene, but he denied he was the gunman, claiming that he was essentially a "look out." Detective Morris noted that Felts wore his hair in braids. Detective Morris acknowledged that when he interviewed the appellant, he had no braids, no tattoos, and no gold in his mouth.

Robert Wayne Bell, the owner of the Second Amendment Gun Shop in Springfield, testified that on May 25, 2006, the appellant bought "a Wasser Ten semi-automatic rifle," ammunition, and a carrying case for the rifle. Bell explained the rifle was "an AK variant . . . thirty caliber rifle."

The State rested its case-in-chief. The sole defense witness was the appellant's mother, Brenda Maritz. Ms. Maritz testified that the appellant was twenty years old and had graduated from Springfield High where he played sports and made decent grades. After graduation, the appellant worked a full-time job and attended technical school where he studied electrical engineering. She said that he was never in trouble in school, that he had no propensity for violence, and that the instant charges were "out of character." She acknowledged that the appellant never told her he had purchased a rifle.

Over the defense's objection, the State called Nathan Holden as a rebuttal witness. Holden testified that his nickname was "Big Nate." Holden said that he met the appellant when they were in middle school and that he met Felts when he was nine or ten years old. Holden said that in Spring 2006 he would sometimes "hang out" with Felts and the appellant.

Holden said that on June 14, 2006, he was "sitting home bored," so he called the appellant at approximately 6:00 p.m. The appellant said he was "just sitting at the house," and Holden suggested the appellant pick him up so they could "go riding." The appellant said he would pick him up in five or ten minutes, but he did not arrive until 9:30 or 9:45 p.m. They then picked up Felts, who lived nearby.

They rode around town for thirty or forty-five minutes in the appellant's white Monte Carlo, then they went to the Southfield Apartments where they parked by the "last building," near a dumpster. The appellant told Holden to knock on Elmore's door and tell her to get England. Holden and the appellant knew Elmore and England from school. Holden asked the appellant, "You got legs like I got legs, you know what I'm saying, why can't you walk up there?" In response, the appellant pulled a gun from behind Holden's seat, pointed it at Holden, and said, "[I]f you don't go, I'm going to shoot you." Holden saw a bandana in the console of the car.

Holden complied, and Elmore left her apartment to get England. Holden stood in the breezeway until the appellant whistled and motioned for Holden to return to the car. When Holden got into the car, the appellant and Felts got out. The appellant and Felts were dressed in black and had their faces covered; the appellant held the gun. They ran toward the breezeway and waited behind bushes.

When Elmore and England walked into the breezeway, the appellant and Felts jumped out, and the appellant pointed the gun at them. England put his hands in the air, and Elmore went into her apartment. Holden saw England, Felts, and the appellant "walking fast, like kind of running," to England's car. England was in front, followed by the appellant who had a gun pointed at England's back.

When they got to the car, Felts stood by the trunk. The appellant, with the gun pointed at England, stood at the driver's side door while England got into his car. The appellant noticed that a crowd had come into the parking lot and pointed the gun at the crowd. While the appellant was distracted, England drove away. The appellant shot at the car, and a bullet struck the back window.

The appellant and Felts ran to the appellant's car, and left the scene. The appellant told Holden and Felts not to say anything, that no one was hurt, and that he was just doing it "for fun." The appellant took Holden and Felts home. Holden said he did not know what happened to the appellant's gun.

Holden said he did not call police because he was afraid the appellant would retaliate against him. He said Felts wore his hair in braids, but the appellant did not. Holden said he

-6-

pled guilty to facilitation of especially aggravated kidnapping. In exchange for his testimony against the appellant, he received a sentence of eight years, with one year to be served in confinement and seven years to be served on probation.

At the conclusion of the proof, the jury convicted the appellant of especially aggravated kidnapping, a Class A felony, and reckless endangerment, a Class A misdemeanor.[1] The trial court found the appellant to be an especially mitigated offender and imposed concurrent sentences of 13.5 years for the especially aggravated kidnapping conviction and eleven months and twenty-nine days for the reckless endangerment conviction.

On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions, the propriety of Holden's rebuttal testimony, the admission of testimony from Bell regarding the similarity of the gun purchased by the appellant and the casing found at the crime scene, and the State's comments during closing argument regarding the appellant's failure to testify.

## II.  Analysis

### A.  Sufficiency of the Evidence

As the appellant's first issue, he contends that the trial court erred by failing to act as thirteenth juror to grant his motion for new trial, citing Tennessee Rule of Criminal Procedure 33(f). However, we note that Rule 33 has been revised and section (f) has been removed. See Tenn. R. Crim. P. 33(d) (delineating the new thirteenth juror rule that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence); State v. Ronald Dillman, Jr., No. E2009-00648-CCA-R3-CD, 2010 WL 1854135, at **7-8 (Tenn. Crim. App. at Knoxville, May 7, 2010), application for perm. to appeal filed, (June 28, 2010). However, we construe the appellant's complaint to be a concern about the sufficiency of the evidence supporting his convictions. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993).

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact

---

[1] While the jury found the appellant guilty of the lesser-included offense of reckless endangerment, it found him not guilty of the charged offense of attempted first degree murder.

could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was convicted of especially aggravated kidnapping and misdemeanor reckless endangerment. Tennessee Code Annotated section 39-13-305(a)(1) defines especially aggravated kidnapping as false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." False imprisonment is defined as the knowing removal or confinement of "another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302. Tennessee Code Annotated section 39-13-103(a) defines reckless endangerment as "recklessly engag[ing] in conduct that places or may place another person in imminent danger of death or serious bodily injury."

England testified that two masked men approached him in the breezeway near Elmore's apartment and that one of the men pointed a gun at his head. The assailants did not allow England to turn, so he was unable to positively identify them; however, he believed that the gunman wore his hair in braids. Elmore said that despite the masks, she recognized the assailants as Felts and the appellant. Further, Elmore affirmatively identified the gunman as the appellant, despite acknowledging he did not wear braids in his hair. The assailants made England walk back to his car and get in the vehicle. When Babb provided a distraction, England drove away. The appellant shot England's car; one bullet pierced the rear windshield, grazed England's arm, and exited the front windshield. The appellant gave a statement saying that he participated in the offenses but alleging that Felts was the gunman. Essentially, the proof adduced established that the appellant and Felts used a weapon to force England to go to his car, and discharged the weapon at him as he drove the car away. Therefore, we conclude that, regardless of whether the appellant was the gunman or the

gunman's accomplice,[2] the evidence was sufficient to support the appellant's convictions of especially aggravated kidnapping and reckless endangerment.

## B.  Rebuttal

The appellant next argues that the trial court erred in allowing Holden to testify as a rebuttal witness.  The appellant contends that Holden's testimony was "beyond the scope" of the defense testimony of the appellant's mother, Ms. Maritz.  The record reflects that the State rested its case-in-chief on Monday, April 2, 2007.  Due to a scheduling issue, the defense did not present its case until Thursday, April 5, 2007.  The appellant had planned to call Holden as a witness but decided to proceed with Ms. Maritz as the sole defense witness.

Ms. Maritz testified regarding the appellant's graduation from high school and his participation in sports.  She stated that the appellant worked all through high school and that, at the time of the offense, he attended technical school and had full-time employment.  Ms. Maritz said that the appellant was independent, making his own spending money and paying for his own car.  She stated that the appellant never went anywhere unless it was related to sports or work.  Ms. Maritz said all of the appellant's friends were associated with his work or sports.  Ms. Maritz testified that when the appellant was arrested, he told her that he had not done anything.  Ms. Maritz stated that the instant charges were "out of context, out of character" for the appellant.  She also stated that the appellant never gave her trouble, never did drugs, and had no propensity for violence.  She said that after the appellant's arrest, he became active with the church youth "trying to help the young boys to not get into trouble, as [him]self . . . also got into by being persuaded in the wrong direction."

After the defense concluded, the State proposed to call Holden as a rebuttal witness, explaining that Maritz had "testified how good a boy [the appellant] is" and that her testimony implied that the appellant "wouldn't be involved or wouldn't start this."  The State maintained that "Mr. Holden's account of what happened that night would go to rebut that, about how good a person he is" and that his testimony would rebut Maritz's implication that the appellant was a "good . . . person . . . that he had to have been drawn into that."  The

---

[2]  Tennessee Code Annotated section 39-11-402(2) provides that a defendant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense."  In other words, when a defendant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, the defendant is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime.  State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997).

appellant objected to Holden as a rebuttal witness, arguing that Holden was a "fact witness" who could not be called because the State had concluded its case-in-chief.

The trial court held a jury-out hearing regarding Holden's proposed testimony, during which Holden stated that he had known Felts and the appellant for years. Holden said that on June 14, 2006, the appellant picked up him and Felts and drove them to Southfield Apartments. The appellant told Holden to go to Elmore's apartment and have her get England. Holden was reluctant to go but complied when the appellant pointed a "big gun" at him. When Elmore left to retrieve England, the appellant called Holden back to the car. The appellant and Felts, wearing masks, got out of the car and "jumped out" at Elmore and England. The appellant pointed the gun at England, and the appellant and Felts walked behind England to his car. England got into his car and, when the appellant's attention was diverted, drove off. The appellant shot England's car, he and Felts ran back to the appellant's car, and the appellant drove away. The appellant took Felts and Holden home, ordering them not to say anything because he had done it "just for fun."

The trial court allowed Holden to testify, finding his testimony was proper rebuttal. In denying the appellant's motion for new trial, the trial court explained its ruling:

> I tried two of these cases with Mr. Felts first and then [the appellant]. The testimony in [the appellant's] case, it was very clear that [the appellant] was an active participant in the especially aggravated kidnapping of [the victim]; they took him by gunpoint and started walking toward his car. That's where the kidnapping occurred. [The appellant] was identified as one of those persons. That was the testimony that was heard in the State's case in chief.
>
> Then [the appellant's] mother testified basically that he was a good guy, and that he wouldn't have been involved in this type of thing because he was such a good guy. Now, she didn't testify to that but that's in substance what was being presented to the jury. The State then called Mr. Holden to rebut that testimony in a sense.

On appeal, the appellant argues that Holden's testimony should have been limited to specifically rebutting Ms. Maritz's testimony regarding the appellant's school, participation in sports, or employment. The appellant contends that "the State's true purpose in calling Mr. Holden was not to rebut Mrs. Maritz's character testimony at all, but to get another

-10-

version of the alleged facts of this case before the Jury after the State had rested their case-in-chief."

"Rebuttal evidence is 'any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). Questions regarding the admissibility of rebuttal evidence are left to the sound discretion of the trial court and will only be overturned if the court has clearly abused its discretion. Id.

The appellant argues that, based upon State v. West, 825 S.W.2d 695 (Tenn. Crim. App. 1992), the trial court should have excluded Holden's rebuttal testimony. In West, this court stated that if the proposed rebuttal witness was an eyewitness, provided the State's strongest evidence, and should have been presented in the State's case-in-chief, then the rebuttal testimony is not proper. Id. at 698. The court also concluded that the State's error in failing to disclose the rebuttal witness prior to trial was outside "the applicable norms or a level-handed prosecution" and therefore constituted reversible error. Id.

In the instant case, as in West, Holden was a strong fact witness. However, in West the contested testimony was improper because it did not rebut any of the defense proof and thus belonged in the State's case-in-chief. See State v. Dellinger, 79 S.W.3d 458, 489 n. 12 (Tenn. 2002). In the instant case, the trial court found that Holden's testimony rebutted the implication left by Maritz's testimony, namely that the appellant would not commit the offenses because he was "a good guy" and that he got into trouble "by being persuaded in the wrong direction." Holden's testimony demonstrated that not only did the appellant commit the offenses but that he initiated the crimes. Therefore, Holden's testimony was rebuttal evidence. Accordingly, the appellant is not entitled to relief on this issue.

## C. Gun Shop Owner

The appellant challenges the admission of Bell's testimony regarding the appellant's purchase of a rifle prior to the offense. The appellant contends that Bell's testimony "was more prejudicial than probative" in that "[t]he State did not present any evidence to tie the gun owned by the [appellant] to the crime." The appellant also challenges Detective Morris's testimony regarding the shell casing found at the scene, arguing that the State failed to qualify Detective Morris as an expert in the identification of ammunition and that "the State offered no proof whatsoever that the shell casing recovered . . . was in any way relevant to the events of June 14, 2006." The appellant objected to Bell's testimony, but the trial court overruled the objection. However, the appellant acknowledges that he did not object to Detective Morris's testimony at trial. Moreover, he acknowledges that he did not include

either issue in his motion for new trial, but he argues that the admission of the foregoing proof was plain error.

Rule 3(e) of the Tennessee Rules of Appellate Procedure provides that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." However, Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Upon review of the record, we conclude that although the record clearly established what occurred in the trial court, the remaining Adkisson factors are not present. The testimony about the appellant's gun and the shell casing was relevant to the trial. See Tenn. R. Evid. 401 and 402; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Bell testified that the appellant purchased an "AK variant." Detective Morris testified that he was familiar with SKS and AK type rifles through his SWAT police training and his hunting experience. Based upon that familiarity, Detective Morris testified that the shell casing found in the parking lot was the type used in an SKS or AK type rifle. The challenged testimony was not unduly prejudicial, especially considering the appellant's statement in which he acknowledged purchasing an SKS rifle from a gun store in Springfield about a month prior to the crime. Most importantly, given the testimony of two eyewitnesses to the crime and the appellant's statement, all of which tied the appellant to the crime, the challenged evidence was not so great that it probably changed the trial's outcome. See Adkisson, 899 S.W.2d at 642.

## D. Closing Argument

Finally, the appellant argues that "in closing argument, the State twice improperly commented on the [appellant's] failure to testify on his own behalf." Specifically, the appellant challenges the following portions of the State's closing argument:

> Now, what is his defense? It is not oh – his statement had to have been a lie because he was at work that night. You didn't hear from any of his employers. It's not he was with me that night. You didn't have a cousin come in here and say no, he was with me. It couldn't have happened. No, that wasn't his defense. His one defense was his mother. Say how good of a boy he was.
>
> . . . .
>
> . . . . He is guilty of especially aggravated kidnapping and there has been no proof, whatsoever, that the statement was false, that he was in any other location, no proof at all. If he was with his Mom, he would have said I was at home that night. He wasn't, but I was. And you know, he didn't even tell his Mom what happened. He wasn't questioned until June 20th, six days later. And she is shocked out of the world. He didn't say well, Mom, this is what happened, when he got home on the 14th, he didn't come in and say Mom, this is what happened. I have really made a mistake. He didn't say that to her. Because he intentionally did this. He tried to hide it, pretend like it never happened.

The appellant acknowledges that he did not object to this argument nor did he raise this issue in his motion for new trial; however, he contends that the foregoing closing argument was plain error.

Once again, the appellant has failed to meet all five Adkisson factors for establishing plain error. There is no indication that the failure to object to the argument was not a trial tactic. Moreover, there was no breach of a clear and unequivocal rule of law. The State's argument merely pointed out that the appellant did not present a defense because he had none. He did not argue that he had an alibi or made a false confession; instead, he argued only that his actions were out of character. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. 1999). Our supreme court has stated that "[i]t has long been established that a district

attorney general may argue that the state's evidence is uncontradicted. This argument does not violate the rule prohibiting comments on the failure of the defendant to testify in support of his defense." Id. Thus, we will not address this issue as plain error.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE