IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 25, 2017 Session

## STATE OF TENNESSEE v. LUCAS HUBERT POTTER

**Appeal from the Circuit Court for Blount County**
**No. C24205  Tammy M. Harrington, Judge**

————————————————————

### No. E2016-02268-CCA-R3-CD

————————————————————

The defendant, Lucas Potter, pled guilty to attempted aggravated robbery, attempted robbery, and theft of property under $500.  Tenn. Code Ann. §§ 39-13-401, -402, 39-14-103.  After a sentencing hearing, the trial court denied the defendant's request for judicial diversion and imposed an effective five-year sentence of split confinement with community corrections after 270 days of service.  On appeal, the defendant argues the trial court failed to properly consider his request for judicial diversion and erred in allowing the State to present rebuttal proof at the sentencing hearing.  Following our review of the briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Michael R. Tabler, Knoxville, Tennessee, for the appellant, Lucas Hubert Potter.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Mike L. Flynn, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On March 24, 2016, the defendant, armed with a BB gun, stole gas and attempted to rob two convenience stores in Blount County, Tennessee.  Upon arrest, the defendant

confessed to the crimes and ultimately pled guilty to attempted aggravated robbery, attempted robbery, and theft of property less than $500.00. Tenn. Code Ann. §§ 39-13-401, -402, 39-14-103. As a condition of the guilty pleas, the defendant agreed to allow the trial court to determine the manner and method of service of the defendant's sentences. Accordingly, the trial court conducted a bifurcated sentencing hearing on August 11, 2016 and September 22, 2016. At the first hearing, the State offered the pre-sentence report as its proof, and then rested. The defendant then testified.

The defendant, who was thirty-four years old at the time of the hearing, explained he was diagnosed with manic depressive and bipolar disorders during adolescence. The defendant openly discussed the alienation he felt from others, especially his family, upon his realization that he was gay, noting he relied primarily on his older sister for support. His mental health issues led to multiple suicide attempts, the first occurring at age fifteen. Though the defendant sought treatment for his mental health issues, he was unable to maintain consistent treatment due to lapses in insurance coverage. As a result, the defendant learned to mask his depression with work, holding three jobs at one point in order to stay busy. The defendant also admitted to self-medicating through the use of illegal drugs.

The defendant provided a detailed explanation of his foray into drug use and dependency. Over ten years ago, the defendant met his current life partner who, at the time they began their relationship, was concealing a methadone addiction. His partner's addiction opened the door to the defendant's own six-year addiction to pain medication which he ultimately began satisfying intravenously. The defendant's addiction, fueled by his mental health issues, also led to an eight-month methamphetamine binge which coincided with the death of his sister on January 20, 2016. Subsequent to her death, the defendant found himself unemployed and at the height of his drug usage.

On the night of March 24, 2016, the defendant was out of money and in need of drugs. He stated the idea to rob the first convenience store "was spur of the moment," and it "just popped into [his] head." Upon entering the first convenience store, the defendant kept his BB gun concealed but presented the clerk with a note demanding money. According to the defendant, "I handed [the clerk] a note and she read it over, started laughing, started shaking her head, crumpled it up and threw it back at me and told me to get out of there. So, I did." However, he soon passed another convenience store and attempted a second robbery. This time, the defendant flashed the BB gun at his victim. The defendant stated he "verbally asked for the money this time," but, "[i]t was the same reaction . . . and [he] left." The defendant then pulled into his third convenience store of the night. After filling his car with gas, the defendant attempted to pay for the gas with a check tied to an empty bank account. The clerk refused the check and called the police. The defendant "just drove away" knowing he was stealing gas. When the

police pulled the defendant over later in the evening, the defendant admitted to the crimes, and he was arrested.

The defendant explained that he has been incarcerated since his arrest on March 24, 2016, originally being housed in "D-pod" within the jail. However, after "disrespect[ing] a Vice Lord gang," the defendant was moved to protective custody within the jail. The defendant also spent time in the medical division of the jail after contracting shingles and making three different suicide threats and/or attempts. The first suicide threat occurred upon his initial incarceration and resulted in the defendant being placed on suicide watch for a week. The defendant later made a serious suicide attempt when he used a razor to "slice[] [his] arms open." Subsequently, the defendant began taking Celexa which, according to the defendant, has "helped tremendously."

Despite his improved condition on Celexa, the defendant again threatened to commit suicide on August 8, 2016, just three days prior to the sentencing hearing. The suicide threat came after the defendant believed he would be moved back to "D-pod" upon his release from the medical division.[1] The defendant explained the "threat" as follows:

> It was not really that I was wanting to commit suicide. Last week, I was diagnosed with shingles and I was taken out of the cell that I was in and put in [m]edical until I got cleared of it. Whenever they took me back to [m]edical, they were trying to take me back to D-pod where I had threats against my life. And I told them if I was going to be housed in D-pod I was going to kill myself. Because I wouldn't want to get beat again.

As of the sentencing hearing, however, the defendant had not been moved to "D-pod."

At the conclusion of his testimony, the defendant expressed interest in a future career in law enforcement. He also stated: ". . . one of the reasons I wanted diversion is because I know you can't go into law enforcement if you have felonies on your record. And since being in the jail I have a new respect for officers and what they have to deal with . . . on a daily basis and what they have to put up with from inmates, gives you a new respect for people that do that line of work." During cross examination, the State explored the defendant's statement about his "new respect for officers" further.

Specifically, and in direct response to the defendant's comment, the State questioned the defendant about his "verbally abusive" and threatening behavior towards officers on August 8, 2016. The State asserted the defendant's behavior led to a loss of

---

[1]At the time, the defendant was housed in the medical division of the jail due to contracting shingles.

- 3 -

privileges. The defendant admitted to losing privileges as a result of his behavior on August 8, 2016; however, he explained the loss of privileges resulted "from banging on the door. It wasn't from threatening anyone." The defendant also asserted, "I have never threatened anyone physically." During re-direct examination, the defendant clarified he was upset on August 8, 2016, because he feared he was being placed back in "D-pod" after his release from the medical division of the jail. At the time, he "flipped out" and "started hitting the door." The defendant testified that he was scared of "D-pod," explaining "why would I want to go back somewhere where I'm already in protective custody from being there?"

Subsequent to the defendant's proof, the State offered two witnesses in rebuttal. The defendant objected, asserting the State sought to attack his credibility, which he claimed was a collateral issue that could not be proved through extrinsic evidence. The trial court disagreed, and the State proceeded.

First, the State called Officer Jonathan Buchanan of the Blount County Sheriff's Office. Officer Buchanan stated he responded to an urgent "callout" involving the defendant in the medical division of the jail on August 8, 2016. When he arrived, the defendant "was pretty irate" with another officer upon learning he could not go to the "C-7" area of the jail because he had shingles. The defendant told the officer who refused to let him leave the medical division that "he was going to kick [the officer's] ass." Officer Buchanan described the defendant's actions as follows: "No physical actions as far as like him placing hands on [the officer], but [the defendant] was just really irate and just being very loud, being very disrespectful." Officer Buchanan filed a disciplinary report regarding the incident. In the report, he described the allegations against the defendant as follows: "Interfering with an officer, threats to an officer, disorderly, and refusing an officer's command, lying and deceit."

The defendant waived a hearing on the incident and was again placed on suicide watch. According to Officer Buchanan:

[The defendant] decided that he wanted to go on suicide watch, sir. This has been a -- the thing that you've got to understand, [the defendant's] been doing this for [a] while, sir. And at that point in time when he -- when you physically tell somebody that you want to go on suicide watch, I have to take that seriously, as if he's going to hurt himself. And with that said, he was then taken out of his stripes and put in a suicide gown, sir.

Despite the defendant's fear of being placed in "D-pod," Officer Buchanan was unaware of plans to transfer the defendant to "D pod" on August 8, 2016.

- 4 -

The State next called Lieutenant Keith Gregory of the Blount County Sheriff's Office. Lieutenant Gregory explained that since incarceration, the defendant has required a housing unit where he can be "more closely monitored" as a result of an altercation with another inmate and his suicidal behavior. Lieutenant Gregory recalled the August 8, 2016 "verbal altercation" between the defendant and an officer, though he was unaware of issues between the defendant and the Vice Lords. The State then rested.

The defendant sought judicial diversion from the trial court. The trial court suspended the sentencing hearing until September 22, 2016 in order to monitor the defendant's behavior while incarcerated. The trial court explained:

> But it is often as people apply for release or alternative programs or to be in that type of a program, if there are incidents or if there is discipline or if there's other issues going on in the jail, for me to be able to consider favorable release, I have to have a period of time where there has not been any issues in custody. Because if I'm expected to release someone in the community, then I have to have a period of time where they've been able to follow the rules in custody or there's not been issues.

During the September 22, 2016 hearing, the trial court noted the defendant, a Range I, standard offender, was eligible for judicial diversion. The trial court, however, refused to grant judicial diversion to the defendant. Instead, the trial court ordered split confinement of 270 days, including time served, with the remainder of the defendant's sentences to be served on community corrections. Specifically, the trial court imposed a five-year sentence for the attempted aggravated robbery conviction, a four-year sentence for the attempted robbery conviction, and a 270-day sentence for the theft of property under $500.00 conviction.[2] Additionally, prior to the defendant's release, the trial court ordered a community corrections officer to establish a treatment plan tailored to the defendant, including: mental health treatment, drug and alcohol treatment, and GPS monitoring for sixty days. The trial court also ordered the defendant "to provide a housing plan to Community Corrections that they are to approve" and to remain gainfully employed. The defendant timely appealed.

## ANALYSIS

On appeal, the defendant argues the trial court failed to properly consider the necessary *Parker* and *Electroplating* factors before denying his request for judicial diversion. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *State v.*

---

[2]Though not reflected on the judgment forms, at the September 22, 2016 sentencing hearing, the trial court stated the sentences were to be served concurrently.

*Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). As a result, the defendant asks this Court to conduct a *de novo* review of his request. The State asserts the trial court's denial of judicial diversion was presumptively reasonable and supported by appropriate consideration of the applicable factors. Additionally, the defendant argues the trial court erred in allowing the State to present rebuttal evidence at the sentencing hearing regarding the defendant's behavior while incarcerated. The State asserts the trial court properly sentenced the defendant and did not err in allowing rebuttal proof. Upon our review of both issues, we find no error.[3]

Judicial diversion is a statutorily prescribed alternative to sentencing available to certain criminal defendants "who have entered a guilty or nolo contendere plea or have been found guilty of an offense without the entry of a judgment of guilt." *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014). To be eligible for judicial diversion, a defendant cannot have been previously convicted of a felony or Class A misdemeanor, and the defendant's crimes cannot involve a sexual offense or a Class A or Class B felony. *See* Tenn. Code Ann. § 40-35-313(a)(1)(A), (a)(1)(B)(i)(c), (d) (2013). "Eligibility under the statute does not, however, constitute entitlement to judicial diversion; instead, the decision of whether to grant or deny judicial diversion is entrusted to the discretion of the trial court." *King*, 432 S.W.3d at 323; *see* Tenn. Code Ann. § 40-35-313(a)(1)(A); *State v. Turner*, No. M2013-00827-CCA-R3-CD, 2014 WL 310388, at *4-5 (Tenn. Crim. App. Jan. 29, 2014).

Upon finding a defendant is eligible for judicial diversion, a trial court must then consider:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice - the interests of the public as well as the accused.

*King*, 432 S.W.3d at 326 (quoting *Parker*, 932 S.W.2d at 958); *Electroplating, Inc.*, 990 S.W.2d at 229. The trial court must balance the *Parker* and *Electroplating* factors against

---

[3]"When a record does not include a transcript of the hearing on a guilty plea, [this Court] should determine on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in <u>Bise.</u>" *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). If this Court determines that the record is sufficient for meaningful review, this Court "may review the merits of the sentencing decision with a presumption that the missing transcript would support the ruling of the trial court." *Id.*

one another and explain its ruling on the record. *King*, 432 S.W.3d at 326. "The trial court need not provide a recitation of all the applicable 'factors when justifying its decision on the record in order to obtain the presumption of reasonableness,' but 'the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it.'" *State v. Lacy*, No. W2016-00837-CCA-R3-CD, 2017 WL 1969764, at \*3-4 (Tenn. Crim. App. May 12, 2017) (*citing King*, 432 S.W.3d at 327); *see also State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If the factors are properly weighed by the trial court, this Court reviews the trial court's grant or denial of judicial diversion under an abuse of discretion standard with a presumption of reasonableness. *Id.* (citing *Bise*, 380 S.W. 3d at 707).

When the trial court fails to properly weigh the *Parker* and *Electroplating* factors, "the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." *King*, 432 S.W.3d at 327. Upon such a determination, an appellate court "may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration. The determination as to whether the appellate court should conduct a de novo review or remand for reconsideration is within the discretion of the reviewing court." *Id.* at 328. This Court will "uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id.* at 327.

Here, we first note, the defendant's request for *de novo* review of the trial court's denial of judicial diversion is inappropriate as the record shows the trial court properly considered the *Parker* and *Electroplating* factors before making its decision. *King*, 432 S.W.3d at 326; *Parker*, 932 S.W.2d at 958; *Electroplating, Inc.*, 990 S.W.2d at 229. As such, we will address the defendant's issue regarding the denial of his bid for judicial diversion under an abuse of discretion standard, applying a presumption of reasonableness to the trial court's findings. *King*, 432 S.W.3d at 326.

In this case, the defendant was convicted of attempted aggravated robbery, a Class C felony, attempted robbery, a Class D felony, and theft of property under $500.00, a Class A misdemeanor. The defendant was sentenced as a Range I, standard offender. As a standard offender with no prior criminal history, the defendant is a qualified candidate for judicial diversion. *See* Tenn. Code Ann. § 40-35-313. The trial court noted this finding on the record.

Upon finding the defendant qualified for diversion, the record shows the trial court balanced the *Parker* and *Electroplating* factors against the evidence before it. In doing so, the trial court reviewed the pre-sentence report and considered the sentencing memorandum, the evidence presented during the sentencing hearing, and the appropriate

sentencing guidelines. The record makes clear that the trial court then thoroughly discussed its reasons for denying the defendant's request for judicial diversion.

At the outset, the trial court noted the defendant's request for judicial diversion was "extraordinary" within the context of the crimes for which he was convicted. The trial court noted the defendant's lack of a criminal record clearly weighed in favor of a grant of judicial diversion. However, the trial court placed great emphasis on the defendant's admission that he suffers from severe mental health issues, including manic depressive and bipolar disorders, and from years-long drug abuse. Notably, the trial court acknowledged the defendant's criminal conduct was fueled by his need for money and drugs. In weighing the defendant's social history and mental health status against his request for diversion, the trial court explained:

> I must look to the [d]efendant's physical and mental condition and social history. And I have to look to that as part of the reason why I'm even having this sentencing hearing. It's complicated. He's had a long history of work and different issues that are favorable, but then we also have a history of some alcohol and drug use, as well as some periods of mental instability that, on one hand, are argued as part of the basis for committing the offense, but then on the other hand are argued that that's the very heart of what makes him dangerous. And so, those are complicated. And, like I said, I assume that that's why I'm having this sentencing hearing because those issues go both ways.

> In one way, it forces the [c]ourt to look at whether or not he can be rehabilitated, but on the other hand it forces the [c]ourt to look at whether or not he's a danger to the community because of those very issues. So, once again, that's a very hard balancing act. Looking at the facts and circumstances surrounding the offense and the nature of the circumstances of the criminal conduct involved, once again that goes hand in hand with the alcohol issues, the drug issues . . . as well as the mental health issues.

Accordingly, the record shows the trial court properly weighed the defendant's criminal conduct, social history, and mental health in reviewing the defendant's request for judicial diversion and found each of these factors weighed against granting diversion.

The trial court also addressed the defendant's "amenability to correction," again stating the defendant's case was "very complicated." The trial court balanced its concern "about the [d]efendant's actions while incarcerated" against the defendant's potential for rehabilitation. The trial court provided a thorough explanation of its balancing process, as follows:

And what the [c]ourt has before it is a Class C felony, attempted aggravated robbery, a Class D felony[,] attempted robbery, and a Class A misdemeanor, theft under $500. There is a weapon involved, there is the threat of a weapon involved, there is not one offense, there [are] multiple offenses. There is a period of trouble even after incarceration which is – I'm not going to put a great significance on that but it was significant enough that I reset [the sentencing hearing] to look at whether or not there was any issues. There's no issues before the court. So, I can assume that we've made it through that period of time that I've asked him to make it through.

Though the defendant behaved appropriately in jail after the first sentencing hearing, the trial court acknowledged its inability to predict how the defendant would behave on probation. The trial court again noted it had no prior history to rely on to determine the defendant's future behavior. As such, the record indicates the trial court conducted an appropriate review of the "amenability to correction" factor.

Similarly, the trial court considered whether judicial diversion would "serve the ends of justice" by weighing "the deterrence value to the accused as well as others" against the defendant's request for diversion. The trial court noted it had not heard specific proof on whether confinement was necessary to provide an effective deterrence to others. However, in the defendant's case, the trial court noted full probation was not an option as the defendant has been incarcerated since his arrest on March 24, 2016. The trial court stated, "So that, either way, I don't really have to necessarily even apply that factor because he's not going to get full probation."

Ultimately, after reviewing the *Parker* and *Electroplating* factors, the trial court summarized its reasoning for denying judicial diversion, as follows:

What this really boils down to, without significant intervention and without him accepting the significant intervention, [the defendant is] dangerous. That's the bottom line. And so the [c]ourt has to fashion something in which to be able to balance trying to rehabilitate the [d]efendant. Because that's what the law says that we are supposed to do – that's what we're supposed to look at first -- with also protecting society. And so, the court is going to deny the request for diversion based upon -- well, the reasons I have stated.

Accordingly, the record makes clear that the trial court thoroughly discussed its reasons for denying the defendant's request for judicial diversion after applying the *Parker* and *Electroplating* factors to the defendant's request. The trial court

appropriately discussed the factors on the record and thoughtfully considered the defendant's request for judicial diversion, ultimately finding diversion to be unacceptable due the defendant's criminal activity and his long history of social and mental instability. *See State v. Brooks*, No. W2015-00833-CCA-R3-CD, 2017 WL 758519, at *8 (Tenn. Crim. App. Feb. 27, 2017) (citing *King*, 432 S.W.3d 316, 327 & n.8) ("The trial court is not required to 'recite' all of the factors or use 'magic words' when explaining its decision regarding diversion."). The trial court did not abuse its discretion when denying the defendant's request for judicial diversion. Accordingly, we affirm the sentence imposed by the trial court.

Next, the defendant asserts the trial court erred in allowing the State to present the rebuttal evidence from Officer Buchanan and Lieutenant Gregory at the sentencing hearing. "Rebuttal evidence is 'any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting *Nease v. State*, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). "The state is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" *Id.* (citing *State v. Cyrus Deville Wilson*, No. 01C01-9408-CR-00266, 1995 WL 676398, at *4 (Tenn. Crim. App. Nov. 15, 1995)). The admission of rebuttal evidence lies within the sound discretion of the trial court, and this Court will not overturn the trial court's decision absent an abuse of discretion. *Id.*

In the present case, the defendant testified at the sentencing hearing regarding his "new respect for officers." The State sought to explore the defendant's statement further on cross-examination by asking him about an incident between the defendant and an officer within the jail just three days prior to the sentencing hearing. The defendant acknowledged he was involved in an incident on August 8, 2016, which resulted in his loss of privileges. The defendant provided an explanation for the incident, stating he was upset because he thought he was going to be placed in "D-pod" upon his release from the medical division of the jail. According to the defendant, he was previously threatened by other inmates also housed in "D-pod." When asked if he was verbally abusive and threatening towards officers, the defendant explained he was merely banging on the door during the incident.

In response, the State sought to rebut the defendant's testimony with proof from Officer Buchanan, who responded to the incident on August 8, 2016, and Lieutenant Gregory, who provided facts regarding where the defendant was housed within the jail. Officer Buchanan's testimony provided a different picture of the incident, describing the defendant as "irate" and "disrespectful." Lieutenant Gregory noted the incident consisted of a "verbal altercation" between the defendant and an officer. Additionally, both rebuttal witnesses discounted the defendant's explanation for the incident by noting the

defendant was not being placed back in "D-pod" at the time. Rather, Officer Buchanan explained the defendant was upset because he could not shower in "C-7" because he had shingles.

At the hearing, the trial court found the State's rebuttal evidence addressed the defendant's credibility, and noted, "credibility is always an issue when a witness testifies." We agree. In addition, our review of the record shows the State's rebuttal evidence was in "direct reply" to the defendant's explanation of the August 8, 2016 incident and was entirely appropriate as a result. *Thompson*, 43 S.W.3d at 524 (quoting *Nease*, 592 S.W.2d at 331). The trial court did not abuse its discretion in allowing the State to present rebuttal evidence in response to the defendant's statements regarding his "new respect for officers" and the August 8, 2016 incident as the evidence falls squarely into that permitted on rebuttal. The defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE